## FEDERAL TRADE COMMISSION v. THATCHER MFG. CO.

(Circuit Court of Appeals, Third Circuit. April 16, 1925. Rehearing Denied June 2, 1925.)

No. 3167.

1. Monopolies ⬡⟶20—Corporation held to have acquired stock of competing corporations in violation of Clayton Act.

Corporation manufacturing milk bottles *held* to have acquired, not only physical assets and patent license rights of competing corporations, but their capital stock, in violation of Clayton Act, § 7 (Comp. St. § 8835g).

2. Monopolies ⬡⟶20—"Acquisition," as used in Clayton Act, defined; "ownership."

"Acquisition," as used in Clayton Act, § 7 (Comp. St. § 8835g), prohibiting one corporation acquiring stock of competing corporations, means "ownership," which involves title, legal and equitable.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Ownership; Second Series, Acquisition.]

**3. Corporations ⬲1—Courts look behind corporate fiction to do justice.**

Courts of equity will look behind corporate fiction, and, if one corporation is merely creature of another, it will be treated as practical owner of corporation, when necessary to do justice.

**4. Monopolies ⬲20—Clayton Act is remedial, and not punitive; sole purpose of order of Federal Trade Commission must be to remedy unlawful situation.**

Clayton Act, § 7 (Comp. St. § 8835g), prohibiting one corporation from acquiring stock of competing corporations, where effect is to reduce competition, is remedial, and not punitive, and sole purpose of valid order of Federal Trade Commission must be to remedy unlawful situation.

**5. Monopolies ⬲20—Order of Federal Trade Commission, requiring corporation to divest itself of property of competing corporations, held authorized.**

Order of Federal Trade Commission, requiring corporation to divest itself of property of competing corporations, as well as of their stock acquired in violation of Clayton Act, § 7 (Comp. St. § 8835g), was authorized, where corporation, by its control of such stock, acquired ownership of their property, so that mere divesting itself of stock would leave it in full possession of fruits of unlawful transaction.

**6. Monopolies ⬲20—Clayton Act construed.**

Not every acquisition by one corporation of stock of competing corporations is forbidden by Clayton Act, § 7 (Comp. St. § 8835g), but such acquisition must have effect of substantially lessening competition.

**7. Monopolies ⬲20—Evidence held not to sustain finding that acquisition of stock of another corporation substantially lessened competition.**

Evidence *held* not to sustain finding of Federal Trade Commission that acquisition of stock of corporation chiefly manufacturing whisky and condiment bottles, and only a small quantity of milk bottles, by corporation manufacturing milk bottles, substantially lessened competition, within Clayton Act, § 7 (Comp. St. § 8835g).

Buffington, Circuit Judge, dissenting.

Petition for Enforcement of Order of Federal Trade Commission.

Petition by the Federal Trade Commission against the Thatcher Manufacturing Company to enforce an order of the Commission. Order of Commission modified, and, as so modified, its enforcement directed.

W. H. Fuller, of McAlester, Okl., and A. R. Brindley, of Washington, D. C., for petitioner.

Herbert Knox Smith, of Hartford, Conn., and William W. Porter, of Philadelphia, Pa., for respondent.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

WOOLLEY, Circuit Judge. The Federal Trade Commission asks this court to enforce an order it has made against the Thatcher Manufacturing Company, the respondent, commanding it to cease and desist from the ownership and control of the assets and properties of three corporations which it obtained through its acquisition of their capital stock, to divest itself of the assets and properties so acquired, and to divest itself of the stock or share capital of a fourth corporation. The proceedings were begun by a complaint filed by the Commission under section 7 of the Clayton Act (38 Stat. 730; Comp. St. § 8835g) charging the respondent, first with the acquisition of the entire capital stock of four competing corporations, and, next, with its acquisition of all the assets and properties of three of those corporations through its stock control, the effect of which was substantially to lessen competition, restrain commerce and create in the respondent a monopoly in the business of manufacturing milk bottles. The order was made on elaborate findings of fact based mainly on a stipulation as to facts entered into by the parties and on other matters obtained from records which the respondent freely opened and made available. There is therefore little dispute about the facts and no trouble in deciding that the Commission's findings are, except in one matter, sustained by the evidence. The controversy turns on the inferences properly to be drawn from the facts and therefore on the single question whether the transactions were in violation of section 7 of the Clayton Act. As they were highly complicated we shall, in stating the case, give only enough to show their character and effect.

[1] Of the corporate actors in this case the Thatcher Manufacturing Company, the respondent, is a corporation of the State of New York with its principal office and manufacturing plant at Elmira, New York and branch manufacturing plants in West Virginia and Ohio. It was engaged in the manufacture of milk bottles by automatic bottle-blowing machines under an exclusive patent license from the Owens Bottle Company.

The Essex Glass Company was a corporation of the State of Ohio having its principal office at Mount Vernon, Ohio, and plants in Ohio and West Virginia.

The Travis Glass Company was a corporation of the state of West Virginia, with its principal office and manufacturing plant at

Clarksburg, West Virginia, and a branch plant at Cedar Grove, West Virginia.

The Lockport Glass Company was a corporation of the State of New Jersey with its principal office and manufacturing plant at Lockport, New York.

The Woodbury Glass Company is a corporation of the State of Indiana with its principal office and manufacturing plant at Winchester, Indiana.

The J. T. & A. Hamilton Company was a corporation of the State of Pennsylvania with its principal office and manufacturing plant at Pittsburgh, Pennsylvania.

All these corporations were engaged in manufacturing milk bottles and selling them in interstate commerce in competition with one another and with other concerns similarly engaged.

The Owens Bottle Company was a corporation of the State of Ohio, with factories in Ohio, West Virginia and Indiana, and was engaged in the manufacture and sale of glassware, but not in the manufacture of milk bottles. It had acquired the exclusive right to use the Owens bottle-blowing machines in the United States and had granted the respondent an exclusive license under the patents for the manufacture of milk bottles.

In 1917 the Hartford-Fairmont machine appeared in the art. This was another automatic bottle-making machine and it quickly demonstrated that it was the equal and in some respects the superior of the Owens machine. These two were the only successful entirely automatic bottle-making machines then in use. Exclusive licenses to use the Hartford-Fairmont machines for manufacturing milk bottles were secured by the Essex, Travis, Lockport and J. T. & A. Hamilton Companies. The Woodbury Company secured a non-exclusive license to use the Hartford-Fairmont machines for making bottles of other kinds.

Early in 1919, I. T. Axton, president of the Woodbury Company, conceived a plan of merging the Woodbury Company with the companies that held Hartford-Fairmont licenses. Axton controlled the common stock of the Woodbury Company and secured options on the entire capital stock of the Essex, Travis and Lockport Companies and an option on the machine, license and milk bottle business of the J. T. & A. Hamilton Company. Failing in his attempt to merge these corporations, Axton approached F. E. Baldwin, president of the respondent corporation, and suggested that he take over his options and carry out the merger. Baldwin consulted H. C. Mandeville, a director of the re-

spondent, and also E. D. Libbey, president of the Owens Bottle Company, to that end. The Owens Bottle Company offered no objection to the plan and, being interested in competitive bottle-making machines, Libbey agreed to go into the deal and assist in raising the necessary money, provided he could acquire the Hartford-Fairmont patents. Baldwin, Mandeville and Libbey then took over the Axton options and proceded to exercise them. Up to this time the respondent had not appeared in the transaction. This was in August, 1919; the options expired on September 1, following. With some haste Mandeville secured the incorporation of the Sterling Glass Company, Inc., to serve as a temporary means through which to exercise the options and effect the merger. This company was incorporated under the laws of New York with an authorized capital of $600,000. Stock for $500,000 was issued at par for cash. One half of its issued capital stock was taken by E. D. Libbey and the other half by the respondent. The sum of $2,-110,000 in cash was required to carry out the options. Of this, $500,000 was available from the Sterling Company. The balance, or $1,610,000, Baldwin, Libbey and William Ford, the latter a business associate of Libbey, arranged to borrow from the Guaranty Trust Company of New York on their individual promissory notes, each note to be endorsed by the makers of the other two so that all were equally liable. On August 28, 1919, the stockholders of the Essex, Travis, Lockport and Woodbury Companies and Baldwin, Libbey and Ford met at the office of the Guaranty Trust Company. The precise order of the events which followed is difficult to ascertain. They were in substance as follows:

Baldwin, Libbey and Ford gave the Trust Company their notes for which they received money which they turned over to the Sterling Company, and the Sterling Company, then being in possession of the full purchase price, paid the same to the holders of the stock of the Essex, Travis, Lockport and Woodbury Companies and received their certificates endorsed in blank, which it turned over to the Trust Company as collateral security for the notes. With the balance of the money, the Sterling Company (or Baldwin) paid for the outright purchase of the machines, license and rights of the Hamilton Company. As the order under review does not require the respondent to divest itself of the physical properties purchased from the Hamilton Company, we shall not consider the part of the transaction affecting that

company nor shall we mention it except when necessarily incidental to the other phases of the transaction.

Immediately after the capital stock of the four companies had thus been acquired, Baldwin appeared before the vendors and requested the officers of the four companies to remain in their respective positions and continue the operation of the companies until further directed. The respondent controlled these corporations under their respective managements until January 1, 1920, when their entire business was taken to Elmira and thereafter managed directly by the respondent. After the capital stock of the Essex, Travis, Lockport and Woodbury Companies had been acquired, Baldwin, Libbey, Ford and the Sterling Company entered into an agreement in which by preamble, they stated that it was their purpose at a later date to organize a permanent company to take over the plants and assets of the four companies together with the plants and assets of the respondent, and to that end they agreed that the Sterling Company should save harmless the other parties to the agreement from all liability arising from the notes and that "upon the payment of the said notes all of the collateral thereto shall become the property of the Sterling Company"; that if Libbey should not acquire the Hartford-Fairmont patents, or if the parties should fail to agree upon the form, capitalization, or organization of the permanent company, Libbey and Ford might at any time, on notice to Baldwin, retire from the agreement; that in the event of their retirement, Baldwin should assume all liability under the contract and all liability upon the notes and repay Libbey the $250,000 he had invested in the capital stock of the Sterling Company; and that, thereafter, Baldwin should proceed with the organization of the permanent company in such manner as he might see fit.

Shortly after entering into this agreement Libbey found that he could not acquire the Hartford-Fairmont patents and thereupon served notice on Baldwin of his intention, and the intention of Ford, to retire from the transaction. On the retirement of Libbey and Ford the plan for a permanent corporation, into which all the companies including the respondent were to be merged, came to an end and a new situation arose in which there were outstanding individual obligations of Baldwin, Libbey and Ford amounting to $1,610,000 due the Trust Company, the obligation of Baldwin to buy Libbey's $250,000 of stock in the Sterling Company and his obligation to assume Libbey's and Ford's indebtedness. There was also outstanding an obligation on the part of the Sterling Company to save harmless all the parties to the agreement from all liability arising from the making and endorsing of the notes. The Sterling Company had no money, for it had expended its whole capital of $500,000 in supplying a part of the purchase money for the stock of the four companies. Here the respondent again entered the transaction and gave the Sterling Company $250,000 with which it took up Libbey's stock and received the certificates. The respondent then held $500,000 of the full-paid capital stock of the Sterling Company, all of which had entered into the purchase of the stock of the competing companies. With the Trust Company loan unpaid, the certificates for the stock of the Essex, Travis, Lockport and Woodbury Companies (held by the Trust Company as collateral) were sent to Elmira and there formally cancelled and new certificates issued to persons nominated by Baldwin, and then, on being endorsed in blank, they were delivered to the Trust Company as collateral security for the loan. All the new certificates were issued to four persons, Baldwin, Mandeville, Niver and Collins, officers and employees of the respondent corporation. Baldwin was elected president and Collins secretary of the four companies. None of the persons to whom the stock was issued paid any money for it or gave any other consideration.

The relation of the respondent with the four companies continued financially intimate. It advanced $40,000 to the Woodbury Company and $25,000 to the Travis Company, and received $75,000 from the Essex Company which it mingled with its funds and treated as its own. In an annual report which Baldwin made to the stockholders of the respondent corporation he referred in terms of congratulation to the merging of the Essex, Travis, Lockport and Woodbury Companies with the respondent and its purchase of the Hartford-Fairmont milk bottle machine and business of the Hamilton Company. Without quoting this communication it is enough to say that it states without doubt that the transactions of purchase and merger were made by the respondent corporation and were greatly to its financial advantage.

The indebtedness upon the three notes given by Baldwin, Libbey and Ford was still running, and in order to meet it when it should mature an agreement was made by Baldwin with two bond houses of New York. This agreement provided that the respondent

should acquire all "the assets and business" of the Essex, Travis and Lockport Companies and all the shares of stock of these companies then owned by the Sterling Company (all the stock of the latter company being owned by the respondent), and that it should also acquire all the common stock of the Woodbury Company then owned by the Sterling Company, and that the respondent should assume all the obligations of all of these corporations and that, thereafter, they should be dissolved. It was further agreed that the respondent should increase its capitalization from $1,000,000, to $1,625,000 and should issue $2,000,000 of bonds to which the bond houses would prescribe. All this was eventually, and contemporaneously, carried out at a meeting at which all interested parties were present. At this meeting the Essex, Travis and Lockport Companies, by separate bills of sale, for the consideration of one dollar, conveyed all their property and assets of every kind to the respondent. The respondent delivered to the bond houses $2,000,000 of bonds secured by its mortgage or deed of trust covering all the property which it originally owned and all the property which it had just acquired by the bills of sale. The bond houses paid the respondent for the bonds. With this money the respondent paid the Trust Company the amount due upon the Baldwin, Libbey and Ford notes, and the Trust Company surrendered the shares of the four companies which it held as collateral. Some days later the Essex, Travis and Lockport Companies (together with the Sterling Company) were dissolved. The stock of the Woodbury Company was delivered as additional security for the bonds. In due course the bonds were called and retired and the mortgage or deed of trust given to secure them was canceled. The respondent now holds the entire common capital stock of the Woodbury Company, and all the properties of the Essex, Travis and Lockport Companies free of the lien of the mortgage or deed of trust and free of any obligation arising from the recited transactions.

The provision of section 7 of the Clayton Act which the Federal Trade Commission found that the respondent corporation had violated reads as follows:

"No corporation shall acquire, directly or indirectly, the whole or any part of the stock or other share capital of two or more corporations engaged in commerce where the effect of such acquisition, or the use of such stock by the voting or granting of proxies or otherwise, may be to substantially lessen competition between such corporations, or any of them, whose stock or other share capital is so acquired, or to restrain such commerce in any section or community, or tend to create a monopoly of any line of commerce."

The Commission found that the respondent had violated this section by its "acquisition of the capital stock of the Essex Glass Company, the Travis Glass Company, the Lockport Glass Company, and the common capital stock of the Woodbury Glass Company, on August 28, 1919, and in the subsequent developments and transactions stated in these findings" consisting mainly of the "transfer and conveyance to the respondent of the assets, rights and properties" of these companies, and their subsequent dissolution, and held that "these were an artifice and subterfuge of the respondent to evade the provisions of the said Act of Congress and to escape the penalties thereof." The respondent, on the other hand, thought it discerned in the Clayton Act a difference between the acquisition of stock of a competing corporation and the acquisition of its physical properties and, accordingly, conducted the transactions along the line of that theory. It now complains that the Federal Trade Commission, by its order and by its petition here presented for its enforcement, is endeavoring to enlarge the words and expand the meaning of section 7 of the act from the acquisition of stock of a competing corporation, which in terms is prohibited, to the acquisition of property of a competing corporation, which is not prohibited in terms. However this may be, the record in this case does not raise a question involving this distinction but presents squarely the question whether by the transactions recited the respondent, in violation of the literal terms of the provision, did "acquire, directly or indirectly," the stock of two or more corporations, "where the effect of such acquisition, or the use of such stock by the voting or granting of proxies or otherwise, may be" to bring about the forbidden situation in commerce.

For defense on this issue the respondent admits, of course, that it acquired the physical properties of the named competing corporations but denies that it ever acquired their stock, directly or indirectly. It takes the position that the adventure was Baldwin's; that it was mainly with money borrowed on the credit of his name that the stock was bought; that on the withdrawal of Libbey and Ford the whole liability for meeting the notes and the whole responsibility for putting through the transaction were his;

that the stock was transferred from the vendor holders to his nominees; that the shares were never transferred to the respondent nor was there ever any record evidence of its ownership; that the stock and the administration of the purchased corporations were likewise within the control of Baldwin to do with as he might see fit; that the most the respondent acquired in respect to the stock of the several corporations was the equitable title *after* these corporations had conveyed all their assets and properties to it; and that these conveyances made the stock whose equitable title the respondent had thus acquired valueless, because no assets or properties of any kind stood behind it. And finally, the respondent contends that the Act was not violated because the stock *when* acquired was not the stock of *competing* corporations within the sense of the Act because these corporations in disposing of their physical property to the respondent had also sold to it their licenses for bottle-making machines, without which they were not then able to do business and compete in commerce.

[2] We have not been persuaded to this view of the transaction. To obtain the correct view we shall look at the transaction through the eyes of the statute. Primarily at least the statute (section 7) deals with acquisition of stock of one corporation by another; in terms it is silent as to the acquisition of property of one corporation by another. So, in this case, we shall look for stock acquisition, not for acquisition of property. Acquisition, as that word is used in the statute, means ownership; ownership involves title; and title is of two kinds, legal and equitable. In inquiring into the respondent's ownership of the stock of the four companies we shall look at the title of the stock and follow it through its devolution. In doing this we first find title in the original unnamed owners who for money considerations sold their shares and divested themselves of all title. When the title left them it went to somebody else. Who was it? This question may be answered by finding whose money moved the title from the original owners. Of this money $500,000 was that of the Sterling Company, given it by the respondent and Libbey for the express purpose of buying these shares. The balance of the purchase money was obtained from the Trust Company by Baldwin, Libbey and Ford on their personal notes. On payment for the stock the original owners delivered the certificates endorsed in blank for negotiable purposes. Delivered them to whom? This is not clear; but it is clear that, on delivery, the certificates were lodged with the Trust Company as collateral security for the loan to Baldwin, Libbey and Ford and that the title on leaving the original owners passed to someone else. To whom? This is difficult to answer, and we think not necessary to answer just now, for the reason that the transaction of purchase had not been completed and was then, by the terms of the agreement, liable to transformation, as afterwards occurred. Baldwin had not contributed to the purchase any money of his own although admittedly the purchase money was in part raised on the credit of his name and in part with funds of the Sterling Company, a subsidiary of the respondent. Whether Baldwin and the Sterling Company thus became part owners of the legal or equitable title of the shares is also unnecessary to decide, for the next thing that happened was the transfer of the stock (while still held by the Trust Company as collateral) from the names of the original owners to names of men mentioned by Baldwin, of whom he himself was one. Concededly the other three men had contributed nothing to the stock purchase and never had title in themselves, unless, indeed, they held title for the real owners of the shares, whoever they were.

In this situation the respondent was operating the four companies from its central office, directing its affairs, making financial contributions to and receiving financial returns from some of them.

The next event touching title was the withdrawal of Libbey and Ford from the transaction, leaving Baldwin or someone else to pay their notes when they matured. Baldwin did not meet these obligations but arranged with the respondent to do it. And this the respondent did by first augmenting its assets by acquiring the physical assets and license rights of the three competing corporations and the common stock of the fourth and issuing its bonds for $2,000,000 secured thereby, and with the proceeds of the bonds paying the personal indebtedness of Baldwin, Libbey and Ford. Thus the respondent with its own money directly supplied the larger part of the purchase money, and with its own money, through the Sterling Company, indirectly paid the balance of it. So in the last analysis the whole purchase price of the stock of the four competing corporations was paid by the respondent company with its own funds. While throughout the transaction Baldwin and the respondent kept the name of the respondent off the certificates for the shares of the four companies, the fact

remains that it was with its money that the shares were in part initially bought and at last wholly paid for.

[3] It is difficult to see how the use of the respondent's money in the purchase of the shares did not draw to it the ownership of the shares. The interposition of the Sterling Company, created by the respondent to spend its money in the purchase, was not the act of a legal entity which can blind the court to the real transaction or bar the operation of the statue. "Courts of equity will look behind a corporate fiction, and if it clearly appears that one corporation is merely a creature of another, the latter holding all the stock of the former, thereby controlling it as effectively as it does itself, it will be treated as the practical owner of the corporation, when necessary for the purpose of doing justice." United States v. United Shoe Machinery Co. (D. C.) 234 F. 127; Id. 256 U. S. 451, 42 S. Ct. 363, 66 L. Ed. 708; Brown v. Pennsylvania Railroad Co., 235 F. 669, 149 C. C. A. 89; Id. 250 F. 513, 162 C. C. A. 529. "If any general rule can be laid down, in the present state of authority, it is that a corporation will be looked upon as a legal entity as a general rule, and until sufficient reason to the contrary appears; but, when the notion of legal entity is used to defeat public convenience, justify wrong, protect fraud,or defend crime, the law will regard the corporation as an association of persons." United States v. Milwaukee Refrigerator Transit Co. (C. C.) 142 F. 247.

The respondent paid no money (or, to be specific, it paid only three dollars) for all the assets and plants of three of the competing corporations. It made this large purchase on merely nominal considerations by "use" of its control over these corporations, and its control was effected only because of its ownership of their stock. Baldwin did not own the stock because he had never paid any money for it. If, however, the shares belonged to Baldwin by virtue of their purchase with money partly raised on his note, then the shares still belong to him, for there is no evidence that he has sold them to the respondent. Yet the respondent admits that it holds the equitable title to the shares for the reason that finally the shares were paid for with its money.

Limiting our decision to stock acquisition as distinguished from property acquisition, we are of opinion that the respondent acquired the stock of the Essex, Travis and Lockport Companies in a manner inhibited by section 7 of the Clayton Act if the effect of the transaction was substantially to lessen competition between the corporations, or to restrain commerce, or to create a monopoly. We shall not review the evidence on the effect of the transaction. It will be enough to say that it sustains the finding of the Commission that the effect was that which the statute was enacted to prevent.

[4, 5] To carry out the purpose of the statute the Commission therefore made an order commanding the respondent (a) to cease and desist from the ownership and control of the assets and properties of the three corporations it had acquired through its acquisition of their stock; (b) to divest itself of the assets and properties thus acquired and of the control of the said stock; and (c) to submit for the approval of the Commission a plan for the performance of the order, jurisdiction for that purpose being retained. The respondent maintains that, aside from the merits of the case, the order is invalid first, in that it exceeds the powers conferred upon the Commission by the Act, and second, in that it is, in the circumstances, impossible of performance. It bases its contention first on the statute which it says limits the authority of the Commission to a command addressed to the offending corporation to divest itself of the "stock" of another corporation acquired in violation of the Act, and next on the difficulty, or impossibility, of disassembling the assets of the corporations acquired from assets of its own. On the first position we hold that the Act is remedial, not punitive. Western Meat Company v. Federal Trade Commission (C. C. A.) 1 F.(2d) 95, rehearing 4 F.(2d) 223. Therefore the sole purpose of a valid order of the Commission must be to remedy an unlawful situation. In effecting the remedy, however, the Commission must meet the situation as the offending corporation has made it. If it created the situation so as to defeat the statute, the offending party cannot be heard to say that thereby the Commission is helpless and the law unenforceable. The familiar principal that a person can not profit by his own unlawful act applies. Not in every case can the Commission reach property acquired through stock acquisition, but where, as in this case, the offending corporation has stripped the stock of its value and where, accordingly, the mere divesting itself of the stock would leave the corporation in full possession of the entire fruits of the forbidden transaction, we are of opinion that the statute empowers the Commission to carry out its purpose by extending its hand to the property. Nor do the acts of the offending corporation in commingling the assets of the

corporation whose stock it has acquired in violation of the statute with assets of its own raise a legal barrier against remedying an evil which the law was expressly enacted to prevent. Just how, in a practical way, this shall be done in the case at bar the Commission purposely left open by the last paragraph of the order which directed the respondent to submit a plan to that end. As no plan has been submitted, none is before us. Therefore, with the way to do the thing we are not presently concerned.

The order of the Commission in so far as it relates to the stock and to the assets and properties of the Essex Glass Company, the Travis Glass Company, and the Lockport Glass Company is approved and its enforcement directed.

[6, 7] Not every acquisition by one corporation of the stock of a competing corporation is forbidden by section 7 of the Clayton Act. The Act, by express terms, says that section 7 dose not apply to a corporation "purchasing such stock * * * and not using the same to bring about, or in attempting to bring about, the substantial lessening of competition." Testing the transaction (as it affected the Woodbury Company) by the whole of section 7, the evidence discloses that before the respondent acquired the stock of the Woodbury Company that corporation was engaged chiefly in the manufacture of condiment and whisky bottles and that its manufacture of milk bottles was very small, amounting annually to about 8,000 gross out of a total production in the United States of over 1,000,000 gross. The evidence also shows that it was gradually getting out of the milk bottle business and that, indeed, before the transaction in question arose it had determined to do so. When its stock was acquired the respondent took over its outstanding contracts, one or two in number, and filled them. The respondent's real object in acquiring the Woodbury stock, as we see it, was to acquire its patent license, that being a non-exclusive license to use the Hartford-Fairmont feeders in the manufacture of condiment bottles, fruit juice bottles, fruit containers, fruit jars, and glassware for carbonated soft drinks, branches of the glassware business in which the respondent was not engaged and therefore in which it was not a competitor. While the effect of the transaction upon the Woodbury Company was to stop its manufacture of milk bottles and accordingly to end its competition in milk bottle manufacture, the number of milk bottles the Woodbury Company made was so inconsiderable that the lessening of competi-

tion thereby was not substantial. We are therefore of opinion that the evidence does not sustain the Commission's finding that the respondent's acquisition of the stock of the Woodbury Glass Company substantially lessened competition between the corporations, restrained commerce and tended to create a monopoly. That part of the Commission's order is therefore not approved and will not be enforced.

BUFFINGTON, Circuit Judge. In view of this case involving a far reaching question of jurisdiction I note my dissent. The original purpose Baldwin had in view, and which he finally carried out, was the acquisition and absorption of the several corporations involved by the purchase of their entire properties. If, in so doing, he suppressed competition the remedy for such wrong was vested in the courts and not in the trade commission.

The necessity for the prompt exercises of the options upon such properties, the unlooked for situation created by the withdrawal of his associates and the unloading of the whole financial burden on him together with the complicated stock handlings made necessary in the successful financing of his original plan, gave the matter the appearance, but not the reality of a stock acquisition plan, but in my judgment the transaction as a whole, in its original plan, its execution and effect, was an acquisition of property, not of stock, and jurisdiction over it, if amenable to the law, was vested in the federal courts and not in the Federal Trade Commission.

Such being my view, I feel it my duty to respectfully record my dissent.