**TRANSAMERICA CORP. v. BOARD OF GOVERNORS OF FEDERAL RESERVE SYSTEM.**

No. 10768.

United States Court of Appeals Third Circuit.

Argued March 16, 1953.

Decided July 16, 1953.

164

Gerhard A. Gesell, Washington, D. C. (John Lord O'Brian, Abram J. Chayes, Covington & Burling, Washington, D. C., on the brief), for petitioner.

J. Leonard Townsend, Washington, D. C. (Gregory O'Keefe, Jr., Washington, D. C., on the brief), for respondent.

Before MARIS, GOODRICH and KA-LODNER, Circuit Judges.

MARIS, Circuit Judge.

Transamerica Corporation, a corporation of Delaware, has petitioned this court to review an order of the Board of Governors of the Federal Reserve System entered against it under Section 11 of the Clayton Act, 15 U.S.C.A. § 21, to enforce compliance with Section 7 of the Act, 15 U.S.C.A. § 18. The Board's complaint was issued June 24, 1948 charging Transamerica with having violated Section 7 in that for many years it and its predecessors have continuously and systematically been acquiring the stocks of independent commercial banks located in the five States of California, Oregon, Nevada, Washington and Arizona, and that the effect of such acquisitions may be to substantially lessen competition, restrain commerce or tend to create a monopoly.

Hearings were held on the Board's complaint before a member of the Board as hearing officer. The hearing officer submitted recommended findings to the Board to which exceptions were filed. After hearing the exceptions the Board, two members dissenting, on March 27, 1952 entered the order here challenged, finding that Transamerica's acquisitions and ownership of the stocks of the various banks named in the complaint constituted a violation of Section 7 of the Clayton Act and requiring Transamerica to divest itself of all such stocks, except that of Bank of America National Trust and Savings Association, within an overall period of two years and ninety days.

At the outset we are confronted with a question of jurisdiction. Transamerica sought to have the Board's complaint dismissed and here seeks to have it set aside upon the ground that under Section 11 of the Clayton Act the only authority given to the Board is to enforce compliance with those sections of the Act which are "applicable to banks, banking associations and trust companies," and that the provisions of Section 7 here sought to be enforced do not apply to such institutions. To determine the validity of this contention we turn first

to the language of Section 7 of the Clayton Act, which is as follows:

"Sec. 7. That no corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital of another corporation engaged also in commerce, where the effect of such acquisition may be to substantially lessen competition between the corporation whose stock is so acquired and the corporation making the acquisition, or to restrain such commerce in any section or community, or tend to create a monopoly of any line of commerce.

"No corporation shall acquire, directly or indirectly, the whole or any part of the stock or other share capital of two or more corporations, engaged in commerce where the effect of such acquisition, or the use of such stock by the voting or granting of proxies or otherwise, may be to substantially lessen competition between such corporations, or any of them, whose stock or other share capital is so acquired, or to restrain such commerce in any section or community, or tend to create a monopoly of any line of commerce.

"This section shall not apply to corporations purchasing such stock solely for investment and not using the same by voting or otherwise to bring about, or in attempting to bring about, the substantial lessening of competition. Nor shall anything contained in this section prevent a corporation engaged in commerce from causing the formation of subsidiary corporations for the actual carrying on of their immediate lawful business, or the natural and legitimate branches or extensions thereof, or from owning and holding all or a part of the stock of such subsidiary corporations, when the effect of such formation is not to substantially lessen competition. * * *" 1

■ It will be seen that the significant language of Section 7 is that "No corporation shall acquire * * * the stock * * of two or more corporations engaged in commerce where the effect of such acquisition * * * may be" that denounced by the section. This language is so clear and unambiguous as to leave no room for construction.2 Its sweep includes all "corporations engaged in commerce" without exception. The Board found, and Transamerica does not contest the finding, that the commercial banks the stocks of which are here involved were engaged in interstate commerce.3 Those banks must, therefore, be held to be within the purview of Section 7.

Transamerica argues that Congress has not in the past regulated the banking business by legislation directed to corporations generally but rather by special banking legislation and it says that the legislative history indicates that Congress did not intend to depart from this practice in the Clayton Act. In particular Transamerica points to Section 8 of the Act, 15 U.S.C.A. § 19, which deals specifically with interlocking directors of banks.

■ It may readily be admitted that Congress has in the past customarily dealt with the banking business by special legislation directed solely to that end. This it did under its fiscal and currency powers.4 Indeed

1. 38 Stat. 730, 731–732, 15 U.S.C.A. § 18. Section 7 was amended in 1950. 64 Stat. 1125. The amendment is prospective only. The proceedings here in question were conducted and the order under review was entered under Section 7 as it existed prior to the amendment.

2. Lewis v. United States, 1875, 92 U.S. 618, 621, 23 L.Ed. 513; Standard Fashion Co. v. Magrane-Houston Co., 1922, 258 U.S. 346, 356, 42 S.Ct. 360, 66 L. Ed. 653.

3. This finding was clearly correct. National Labor Relations Board v. Bank of America etc., 9 Cir., 1942, 130 F.2d 624, 626, certiorari denied 318 U.S. 791, 792, 63 S.Ct. 992, 87 L.Ed. 1157, 1158; United States v. South-Eastern Underwriters Association, 1944, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440.

4. McCulloch v. State of Maryland, 1819, 4 Wheat. 316, 17 U.S. 316, 4 L.Ed. 579; Osborn v. President, etc., of Bank of United States, 1824, 9 Wheat. 738, 22 U.S. 738, 6 L.Ed. 204; Farmers' and Mechanics' National Bank v. Dearing, 1875, 91 U.S. 29, 23 L.Ed. 196.

more than 100 years ago the Supreme Court had held that banking was not commerce.[5] It is, therefore, doubtless true that the members of Congress in enacting Section 7 of the Clayton Act in 1914 did not specifically contemplate that "corporations engaged in commerce" would include banks. We find nothing in the legislative history, however, to indicate that Congress did not intend by Section 7 to exercise its power under the commerce clause of the Constitution to the fullest extent. The avowed purpose of the Clayton Act was to supplement the Sherman Act, 15 U.S.C.A. §§ 1–7, 15 note, by arresting in their incipiency those acts and practices which might ripen into a violation of the latter act. Since the general language of the Sherman Act was designed by Congress "to go to the utmost extent of its Constitutional power in restraining trust and monopoly agreements" [6] the supplementary general language of the Clayton Act was undoubtedly intended to have the same all inclusive scope.

We turn then to the merits of the case. The Transamerica group had its origin in 1904 when A. P. Giannini organized the Bank of Italy (now Bank of America National Trust and Savings Association) with headquarters in San Francisco. This bank is said to be the largest bank in the world, due principally to the fact that more than 550 independent banks and branches in the State of California have been acquired and either converted into branches of Bank of America or merged or consolidated with it. Until 1917 these acquisitions were made by individual officers of the bank, who pledged their personal credit when stock of an independent bank was being purchased. In that year Stockholders Auxiliary Corporation, a Transamerica predecessor, was organized and this company thereupon acted as purchaser of independent banks in California destined for inclusion within the Bank of America system.

In 1918 another corporation, Bancitaly Corporation, was organized by A. P. Giannini, the largest stockholder of which was Stockholders Auxiliary Corporation. This company acquired the stocks of various banks located in New York City and certain foreign countries. Later on its also acquired stock interests in California banks. In 1924 still another corporation was formed called Americommercial Corporation and it, too, acquired controlling stock interests in California banks. In 1928 Transamerica Corporation, the petitioner here, was organized to take over stock control of Bank of America and its affiliated companies. Since that time Transamerica has acted as purchaser of independent banks in California for Bank of America.

In 1930 Transamerica acquired The First National Bank of Portland, Oregon, which has since become the principal Transamerica branch banking system in that state. In 1934 it acquired the First National Bank in Reno, Nevada, the name of which has subsequently been changed to First National Bank of Nevada. In 1936 it acquired the National Bank of Tacoma, Washington, the name of which was later changed to National Bank of Washington. In 1937 it acquired the First National Bank of Arizona at Phoenix, the Phoenix National Bank and the Phoenix Savings Bank & Trust Company (the latter being an affiliate of the Phoenix National Bank). The Phoenix National Bank and the First National Bank of Arizona at Phoenix were later consolidated as the First National Bank of Arizona. Numerous subsequent acquisitions of independent banks were made by Transamerica in these four states, most of which have been converted into branches of the banks just mentioned.

Commencing in 1937 Transamerica, which then held substantially all the stock of Bank of America, began a program of voluntary disposal of these holdings. In that year it distributed 58% of this stock to its own shareholders. By 1948 Transamerica's holdings of Bank of America stock had been reduced to 22.88% and by 1951 to 7.66%. On October 20, 1952 the last of the stock was disposed of so that today

5. Nathan v. Louisiana, 1850, 8 How. 73, 49 U.S. 73, 12 L.Ed. 993.

6. United States v. South-Eastern Underwriters Association, 1944, 322 U.S. 533, 558, 64 S.Ct. 1162, 1176, 88 L.Ed. 1440.

Transamerica has no stock interest whatever in Bank of America. Also upon the death of L. M. Giannini on August 19, 1952 the two corporations ceased to have any director in common.[7] The Board, nonetheless, in its findings of fact included Bank of America in the Transamerica banking group, along with 47 majority owned banks which Transamerica had acquired in the five states, since it regarded Transamerica as still exercising effective control over Bank of America in spite of its then comparatively small stock interest. The Board did not include Citizens National Trust and Savings Bank of Los Angeles, in which Transamerica also has a minority stock interest, however, since it did not find that Transamerica exercises control over that bank.

The Board's findings of fact set forth the growth, by years, in banking offices, deposits and loans of the Transamerica banking group. This growth has been steady. The Transamerica group controls approximately 645 or 41% of all commercial banking offices in the five-state area. In addition the Transamerica group holds approximately 39% of all commercial bank deposits and approximately 50% of all commercial bank loans in the five-state area.[8] On the basis of such overall figures as these and without any findings as to the competitive effect of Transamerica's bank acquisitions in the communities in which the banks operate the Board reached its conclusion that the acquisitions violated Section 7 of the Clayton Act and accordingly called for the order of divestment here under review.

It will be recalled that Section 7 makes unlawful the acquisition of the stock of two or more corporations engaged in interstate commerce where its effect "may be to substantially lessen competition between such corporations, or any of them, whose stock or other share capital is so acquired, * * or tend to create a monopoly of any line of commerce." The contention of Transamerica is that the Board's findings wholly fail to furnish support to the conclusion that the effect of Transamerica's acquisitions of bank stocks may be to substantially lessen competition between the acquired banks or that those acquisitions may tend to create a monopoly in the banking business.

We think that Transamerica's contention with respect to substantial lessening of competition must be sustained. The ban imposed by Section 7 in this regard is solely against stock acquisitions which may have the effect of substantially lessening competition between the companies acquired. The application of this clause obviously requires a preliminary determination of the area of effective competition between the companies involved before the question of competition between them may be considered. The Board has made such a determination in this case, finding that the business of commercial banks is largely local and confined to the communities in which they operate and in which customers may conveniently visit them. The Board made this finding in subparagraph (f) of Paragraph Seven of its findings of fact, as follows:

"Because of the frequency of need for access to one or more of the services of commercial banks, such banks draw their business largely from areas within which customers may conveniently visit the banks as occasion may require. Thus, in this aspect of their customer relations, commercial banks are largely local, and for the usually needed customer services a distant bank cannot adequately serve a customer. Very large concerns with national credit standing have access to credit from banks in many parts of the country and may also maintain accounts in widely scattered banks. This does not apply, however, to the great multitude of the customers of commercial banks. The smaller concerns, local business

7. These events of 1952 do not appear in the record but Transamerica has asked leave to introduce evidence establishing them and the Board concedes that they have occurred. Brief for respondent, p. 66.

8. If the business of Bank of America were excluded these percentages, according to Transamerica's Exhibit 271, would be only 7% of deposits and 6.5% of loans.

enterprises, and ordinary citizens must depend upon their local commercial bank or banks for the financial services peculiar to such banks; for all these customers there is no alternative or substitute, because distantly located banks do not serve or supply their needs."

■ Likewise it must appear that substantial competition exists between the acquired companies which may be subject to substantial lessening as the result of their acquisition by a common owner.[9] In the present case the Board has made no findings with respect to either present or possible future competition between the individual acquired banks in the communities in which they operate. Indeed it rejected evidence on this subject offered by Transamerica. Moreover as to 38 of the acquired banks there could hardly be a finding of such competition since none of them is located in the same community as any other acquired bank. While the remaining 10 banks are not eliminated by this geographic test the mere showing of common ownership will not support an inferential finding that competition between them exists and may be lessened.[10]

■ The Board's ultimate finding on this score was "that the effect of its [Transamerica] holding and use of such stocks may be to substantially lessen competition and restrain commerce in commercial banking in the States of California, Oregon, Nevada, Arizona, and Washington." This finding is deficient in two respects. It is not directed to competition between the acquired banks, the only competition with which Section 7 is concerned. And it sets up a five-state area of competition for which there is no support in the evidence and which is inconsistent with its own specific finding on this point to which we have already referred. So far as concerns the

portion of this finding that the effect of these stock acquisitions may be to restrain commerce in commercial banking in the five-state area it is sufficient to say that the Board did not refer to it in this court either in its brief or in oral argument and evidently does not rely upon it.

We turn then to the consideration of the Board's conclusion that Transamerica's bank stock acquisitions violate Section 7 of the Clayton Act because they may tend to create a monopoly in the commercial banking business in the five-state area. The Board states its theory thus: Because of governmental restrictions there are only a limited number of commercial banking offices serving the public in any designated area. Principally as a result of hundreds of acquisitions of independent banks one small banking institution organized in San Francisco in 1904 has been built into a vast integrated network of 645 banks and branches now located over a five-state area. These offices represent 40.9% of all commercial banking offices in that area, and they hold 38.8% of all deposits and 49.9% of all commercial loans therein. Despite the tremendous growth of population and economic activity in that area in recent years, the total number of all banking offices therein has decreased since Transamerica was organized in 1928, while the number of banking offices in the Transamerica group has increased during that time. By every applicable standard in assessing the economic power of an integrated group of banks, that of the Transamerica group has been always on the increase. Furthermore, Transamerica is constantly seeking to acquire additional banks and, unless restrained, intends to do so. Because the Transamerica acquisitions have systematically and continuously eliminated competition over the years, and because its total of controlled banking offices has been

9. International Shoe Co. v. Federal Trade Commission, 1930, 280 U.S. 291, 298, 50 S.Ct. 89, 74 L.Ed. 431; Federal Trade Commission v. Thatcher Mfg. Co., 9 Cir., 1925, 5 F.2d 615, 622, affirmed in part, 272 U.S. 554, 560, 47 S.Ct. 175, 71 L. Ed. 405; V. Vivaudou, Inc. v. Federal Trade Commission, 2 Cir., 1931, 54 F.2d

273. Compare United States v. Columbia Steel Co., 1948, 334 U.S. 495, 527, 68 S.Ct. 1107, 92 L.Ed. 1533.

10. Temple Anthracite Coal Co. v. Federal Trade Commission, 3 Cir., 1931, 51 F.2d 656; Pennsylvania R. Co. v. Interstate Commerce Commission, 3 Cir., 1933, 66 F.2d 37.

steadily increasing as a result of such acquisitions, thus demonstrating a patent, not to say inexorable, movement in the direction of monopoly, the Board concludes that the cumulative effect of such acquisitions may be to create a monopoly within the five-state area.

It will be seen that the Board paints with an exceedingly broad brush. By cumulating the acquisition of banks by Transamerica throughout the five-state area and including Bank of America (in which Transamerica no longer has any stock interest) the Board shows the growth of a banking group which, it asserts, is moving toward a monopoly in banking in the five states. We agree that this quantitative analysis discloses a tremendous concentration of banking capital, and thereby of economic power, in the hands of the Transamerica group which may be unwise and against sound public policy. It may well be in the public interest to curb the growth of this banking colossus by appropriate legislative or administrative action. This, however, is not for us to decide. Our only question is whether the theory upon which the Board based its decision meets the legal tests which are required under Section 7 of the Clayton Act to determine whether Transamerica's bank stock acquisitions tend to create a monopoly of commercial banking. We are compelled to agree with Transamerica that it does not do so.

A monopoly involves the power to raise prices or to exclude competition when the monopolist desires to do so.[11] Obviously, under Section 7 it was not necessary for the Board to find that Transamerica has actually achieved monopoly power but merely that the stock acquisitions under attack have brought it measurably closer to that end. For it is the purpose of the Clayton Act to nip monopoly in the bud. Since by definition monopoly involves the power to eliminate competition a lessening of competition is clearly relevant in the determination of the existence of a tendency to monopolize. Accordingly in order to determine the existence of a tendency to monopoly in the commercial banking or any other line of business the area or areas of existing effective competition in which monopoly power might be exercised must first be determined. The Board in this case apparently regards that area as comprising the five states of California, Oregon, Nevada, Arizona and Washington. This, however, is inconsistent with the Board's own finding that the local community in which a commercial bank is located is its area of competition. Moreover it is a mere assumption by the Board wholly unsupported by evidence. No valid reason is shown for taking five states rather than one, the seven included in the federal reserve district or all 48. The Board's conclusion of a tendency to monopoly in the five-state area, therefore, fails for want of a supporting finding that the five states constitute a single area of effective competition among commercial banks and flies in the face of its own finding that the local community is the true competitive banking area.

We, of course, do not hold that no tendency to monopoly by Transamerica in commercial banking could be shown in any of the competitive areas in which its acquired banks operate. It may well be that in some of these areas Transamerica through the acquisition of banks has brought about a substantial lessening in competition and in that and other ways has moved measurably toward monopoly power in those particular areas. The Board has made no such findings, however, nor has it made appropriate supporting findings as to the factors which an analysis of the market would disclose to be relevant to the determination of these questions. It has been held that such findings are necessary under Section 7.[12]

The Board does not deny that the

11. American Tobacco Co. v. U. S., 1946, 328 U.S. 781, 811, 66 S.Ct. 1125, 90 L. Ed. 1575.

12. International Shoe Co. v. Federal Trade Commission, 1930, 280 U.S. 291, 298-299, 50 S.Ct. 89, 74 L.Ed. 431; Aluminum Co. of America v. Federal Trade Comm., 3 Cir., 1922, 284 F. 401, certiorari denied 261 U.S. 616, 43 S.Ct. 362, 67 L.Ed. 828; V. Vivaudou, Inc. v. Federal Trade Commission, 2 Cir., 1931, 54 F.2d 273.

cases which have been decided under Section 7 have interpreted and applied that section as we do here. But it asserts that these cases have all been overruled by the opinion of the Supreme Court in Standard Oil Co. v. United States, 1949, 337 U.S. 293, 69 S.Ct. 1051, 93 L.Ed. 1371, in which Section 3 of the Clayton Act, 15 U.S.C.A. § 14, was held violated upon the mere showing that by the use of the exclusive dealing contracts there involved competition had been foreclosed in a substantial share of the line of commerce affected. We do not think that the Standard Oil case has any such effect. Section 3 of the Clayton Act deals with exclusive dealing contracts, not with stock acquisitions. The use of exclusive dealing contracts per se lessens competition, however, so that the fact of lessening need not be proved. For one who agrees to purchase all his requirements from a single seller is legally barred from purchasing them from anyone else and is consequently eliminated entirely from the competitive market. In order to establish a substantial lessening of competition in such a case, therefore, it is only necessary in addition to prove that the sales covered by the exclusive dealing contracts amount to a substantial portion of the total involved in the competitive market area.[13] This is precisely what was held in the Standard Oil case.

■ The situation with respect to corporate stock acquisitions, the subject matter of Section 7, is wholly different, however. For the acquisition of the stock of two or more corporations engaged in interstate commerce is not per se a violation of the section.[14] On the contrary such acquisition is a violation only if its effect may be in fact to substantially lessen competition between such corporations, to restrain commerce or to tend to create a monopoly. Otherwise the acquisition is entirely lawful, so far as Section 7 is concerned. It necessarily follows that under Section 7, contrary to the rule under Section 3, the lessening of competition and the tendency to monopoly must appear from the circumstances of the particular case and be found as facts before the sanctions of the statute may be invoked. Evidence of mere size and participation in a substantial share of the line of business involved, the "quantitative substantiality" theory relied on by the Board, is not enough.

The same considerations serve to distinguish this case from International Salt Co. v. U. S., 1947, 332 U.S. 392, 68 S.Ct. 12, 92 L.Ed. 20, upon which the Board also relies. For that case involved contracts tying sales of an unpatented product, salt, to a patented one, a machine for its use. These contracts, the court pointed out, closed against competition the market for salt by those persons who bought the machines. The contracts therefore per se violated the antitrust laws as to the salt to be purchased under the contracts regardless of its amount. The Supreme Court so interpreted the case in United States v. Columbia Steel Co., 1948, 334 U.S. 495, 522, 68 S.Ct. 1107, 92 L.Ed. 1533.

We conclude that since the Board failed to find the facts as to lessening competition and tendency to monopoly in the areas of effective competition actually involved, its order is unsupported by the necessary findings and cannot stand.

Since we hold that the Board's order must be set aside we need not discuss Transamerica's contentions that it was denied a fair hearing by the manner in which the proceedings were conducted by the Board's hearing officer and by the inability of the Board to provide it with subpoenas to compel the attendance of witnesses and the production of documents. Nor need we consider Transamerica's application for leave to introduce additional evidence to prove that it has now disposed of the remainder of its Bank of America stock and that following the death of L. M. Giannini the two corporations have no longer a

13. In the Standard Oil case Justice Frankfurter said: "Since it is the preservation of competition which is at stake, the significant proportion of coverage is that within the area of effective competition." 337 U.S. 293, 299–300, note 5, 69 S.Ct. 1055, 93 L.Ed. 1371.

14. International Shoe Co. v. Federal Trade Commission, 1930, 280 U.S. 291, 298, 50 S.Ct. 89, 74 L.Ed. 431

common director. For if the Board should decide, in the light of this opinion, to proceed further against Transamerica that corporation will, of course, have full opportunity to introduce this and all other relevant evidence to which its application for leave was directed.

The order of the Board of Governors of the Federal Reserve System will be set aside.