**UNITED STATES of America, Plaintiff,**

v.

**ARCHER–DANIELS–MIDLAND COM-
PANY and Nabisco Brands,
Inc., Defendants.**

**Civ. No. 83–51–D.**

United States District Court,
S.D. Iowa, C.D.

April 5, 1984.

Kenneth L. Jost, Bruce K. Yamanaga, Rosemary E. Glynn, Scot B. Hutchins, U.S. Dept. of Justice, Antitrust Div., Washington, D.C., for plaintiff.

J. Randolph Wilson, Theodore Voorhees, Washington, D.C., Lance A. Coppock, Des Moines, Iowa, Owen M. Johnson, Jr., Washington, D.C., Mark Schantz, Des Moines, Iowa, for defendants.

## MEMORANDUM OPINION, RULINGS AND ORDER GRANTING PARTIAL SUMMARY JUDGMENT

VIETOR, District Judge.

The government's complaint alleges that defendants violated section I of the Sherman Act, 15 U.S.C. § 1, and section 7 of the Clayton Act, 15 U.S.C. § 18.

In respect to the Clayton Act claim the defendants have filed a motion for summary judgment and the government has filed a cross-motion for partial summary judgment. The motions raise the issue of whether a lease agreement entered into between defendant Nabisco Brands, Inc. (Nabisco) as lessor and defendant Archer-Daniels-Midland Company (ADM) as lessee constitutes an "acquisition" within the meaning of section 7 of the Clayton Act, which provides in pertinent part:

[N]o person subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another person * * * where in any line of commerce or in any activity affecting commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.

*Id.*

Fed.R.Civ.P. 56(c) provides in part: "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

## UNDISPUTED FACTS

At the time the agreements hereinafter described were entered into, Nabisco and ADM were firms in the corn wet milling industry that produced and sold corn products in the United States.

On June 12, 1982, Nabisco, Clinton Corn Processing Co., a wholly owned Nabisco subsidiary, and ADM entered into three agreements.

The first and basic agreement is a lease agreement dated June 12, 1982, under which Nabisco granted to ADM for a non-cancelable term of thirteen years the right to use the land, buildings and equipment of two plants for corn wet milling operations in Clinton, Iowa, and Montezuma, New York.

ADM pays Nabisco rent each year under the lease, with annual net rental payments starting at $15,200,000 for the first year and then declining gradually thereafter to $9,500,000 in the thirteenth year. ADM has an option to renew the lease for one additional five-year term. The net rental payment for each renewal year is fixed at $15,000,000.

ADM may not make any alterations, improvements or additions exceeding $1,000,000 in cost during any lease year without Nabisco's approval. Upon termination of the lease, all improvements and additions made at ADM's expense become Nabisco's sole property. ADM may not sublease or assign the lease without Nabisco's approval.

ADM has an option to purchase the facilities, exercisable on June 30 in each of the lease years six through eleven (1988–1993) at the prices set forth in Schedule C to the lease. If purchased in year six, the acquisition price is $128,000,000. The annual option acquisition price then declines gradually as the facilities become older to $72,000,000 in year eleven. Thereafter, ADM possesses no option to purchase except as of

the last day of the five-year renewal term. At that time, the purchase price is specified to be the fair market value of the leased assets, excluding any additions or improvements made by ADM at its sole expense. In addition, Nabisco has a one-time option, as of the last day of the initial lease term, to require ADM to purchase the plants for $55,000,000. If none of the above options is exercised, the entire property reverts to Nabisco's sole ownership upon termination of the lease.

The second and third agreements that Nabisco and ADM entered into cover separate matters ancillary to the lease agreement. (In the complaint, neither of these two agreements, standing apart from the lease, has been challenged by the government.) The second agreement transfers to ADM miscellaneous spare parts, fuel, operating supplies, and inventory located at the plants, as well as office space and utility and transportation linkages and agreements. This agreement provides that ADM will not receive any of Nabisco's trademarks or patents, and no Nabisco technology. ADM likewise receives no Nabisco contracts or rights for the purchase and sale of raw materials and/or finished goods inventory related to the leased plants. The third agreement relates to the terms and conditions of employment for any Nabisco employees at the leased plants who were hired as ADM employees.

The lease does not contain bargain purchase options. Instead, the option prices set forth in the lease are estimates of expected future fair market values. The thirteen-year noncancelable term of the lease does not equal or exceed 75% of the estimated economic life of the leased property as of the inception of the lease. After appropriate discount of both the lease payments and the residual value, the present value of the lease payments at lease inception do not equal or exceed 90% of the fair market value of the leased property. As reflected in the opinions of two independent accounting firms, Ernst & Whinney and Coopers & Lybrand, the lease is an operating lease under Financial Accounting Standards Board Statement No. 13. (The government admits the facts set forth in this paragraph for purposes of deciding the pending motions, but reserves the right to contest these facts at subsequent stages of this litigation.)

## CONTENTIONS OF THE PARTIES

Defendants contend that because the lease is an operating lease rather than a capital lease, it is not an acquisition within the meaning of section 7 of the Clayton Act as a matter of law. The government contends that the issue is not governed by the operating lease—capital lease distinction and that the lease is an acquisition within the meaning of section 7 as a matter of law.

## DISCUSSION

The accounting firms of Ernst & Whinney and Coopers & Lybrand, in reaching their opinions that the Nabisco-ADM lease is an operating lease rather than a capital lease, measured the lease under the Financial Accounting Standards Board (FASB) Statement No. 13. Under FASB Statement No. 13, paragraph 7, if at its inception a lease meets one or more of items a. through d. and both e. and f. below, a lessor should account for a lease as a capital lease. (The accountants found that the Nabisco-ADM lease did not meet any of items a. through d.)

a. The lease transfers ownership of the property to the lessee by the end of the lease term.

b. The lease contains a bargain purchase option.

c. The lease term is equal to 75% or more of the estimated economic life of the leased property.

d. The present value at the beginning of the lease term of the minimum lease payments equals or exceeds 90% of the fair value of the leased property to the lessor.

e. Collectibility of the minimum lease payments is reasonably predictable.

f. No important uncertainties surround the amount of unreimbursable costs yet

to be incurred by the lessor under the lease.

Thus, a capital lease appears to be the functional equivalent of an installment sales transaction—a sale in lease clothing.

An operating lease is one that does not meet the above criteria. An operating lease expires at a point in time well before the end of the useful life of the leased assets. If an operating lease includes an option to buy, the purchase price is an amount closely approximating the fair market value of the assets at the time of the purchase, whether the option is exercised at the end of the lease or any earlier date. Accordingly, unlike a capital lease, the rental payments are not substantially the same as periodic payments under an installment sales contract, and the transaction is not the functional equivalent of an installment sale of the leased assets.

For purposes of the pending motions, the court considers the Nabisco-ADM lease to be an operating lease rather than a capital lease.

■ As originally enacted, section 7 of the Clayton Act covered only acquisitions of stock or share capital of another corporation. Act of October 15, 1914, c. 323, § 7, 38 Stat. 731. When Congress passed section 7 in 1914 its principal concern was with activities of holding companies, and particularly the practice whereby corporations secretly acquired their competitors through stock acquisitions. *United States v. Philadelphia National Bank*, 374 U.S. 321, 338, 83 S.Ct. 1715, 1727, 10 L.Ed.2d 915 (1963).

■ As a result of the limited scope of section 7, Congress came to view it as an ineffective weapon in defense of competition. *See id.* at 343 n. 21, 83 S.Ct. at 1730 n. 21. As the Supreme Court observed:

> [T]he courts found mergers to be beyond the reach of § 7, even when the merger technique had supplanted stock acquisitions as the prevalent mode of corporate amalgamation * * *. As a result, § 7 became largely a dead letter.

*Id.* at 338–40, 83 S.Ct. at 1728–1729. To expand the reach of section 7, Congress amended it in 1950 to cover acquisitions of the whole or any part of the assets of another. Act of December 29, 1950, c. 1184, 64 Stat. 1125.

The House Report on the 1950 amendment states:

> The bill retains language of the present statute which is broad enough to prevent evasion of the central purpose. It covers not only purchase of assets or stock but also any other method of acquisition, such as, for example, *lease of assets*. It forbids not only direct acquisitions but also indirect acquisitions, whether through a subsidiary or affiliate or otherwise.

H.R.Rep. No. 1191, 81st Cong., 1st Sess. 8–9 (1949) (emphasis supplied).

No court has yet squarely addressed the question whether an operating lease is an acquisition of assets within the meaning of section 7 of the Clayton Act. The government cites a few cases that skirt the periphery of the question, but they do not supply any clear guidance. However, the following language from *United States v. Columbia Pictures Corp.*, 189 F.Supp. 153, 181–82 (S.D.N.Y.1960), is very instructive:

> As used here, the words "acquire" and "assets" are not terms of art or technical legal language. In the context of this statute, they are generic, imprecise terms encompassing a broad spectrum of transactions whereby the acquiring person may accomplish the acquisition by means of purchase, assignment, lease, license, or otherwise. The test is pragmatic. The final answer is not in the dictionary.
>
> The statute imposes no specific method of acquisition. It is primarily concerned with the end result of a transfer of a sufficient part of the bundle of legal rights and privileges from the transferring person to the acquiring person to give the transfer economic significance and the proscribed adverse "effect."
>
> The broad sweep to be given to the term "acquire" is also suggested by the

circumstance that the following words are unrestricted, i.e., "the whole or any part of the assets." Nothing could be more unqualified than the words "any part." Those words likewise must be given a liberal interpretation.

Consistent with the broadly-drawn language is the word "assets." It is not a word of art, nor is it given a built-in definition by statute. As used in this statute, and depending upon the factual context, "assets" may mean anything of value.

The fact that an item of value may not be treated as an asset for purposes of taxation or bookkeeping, while having some evidential significance, is not conclusive. The word "assets" usually has a technical connotation in the field of taxation and accounting. There is nothing in the legislative history of Section 7 to justify the defendants' viewpoint that the word "assets" is to be interpreted through the eyes of tax experts or accountants rather than business men, or that "assets" means only "capital assets."

Congress was painting with a broad brush when it prohibited the acquisition of the whole or any part of the assets of another corporation, where the effect of such acquisition may be substantially to lessen competition. The language was deliberately couched in general and flexible terms. Its vague contours are characteristic of the antitrust statutes. It is a judicial responsibility to contribute to the fashioning of a coherent body of substantive law out of the Congressional policy and language.

The legislative history language and the language of the court in *Columbia Pictures* strongly suggest that a section 7 acquisition of assets by lease is not limited to capital lease situations.

Defendants cite a few cases suggesting that "acquisition" is a term limited to purchase. These cases, when viewed in their factual and legal context, offer little guidance. Only one is a section 7 case—*Federal Trade Commission v. Thatcher Mfg.*

*Co.*, 5 F.2d 615 (3d Cir.1925), *rev'd on other grounds*, 272 U.S. 554, 47 S.Ct. 175, 71 L.Ed. 405 (1926). Defendant relies on the following language from that case:

> So, in this case, we shall look for stock acquisition, not for acquisition of property. Acquisition, as that word is used in the statute, means ownership; ownership involves title; and title is of two kinds, legal and equitable.

*Id.* at 620. The court was dealing with section 7 as it then existed, covering only acquisitions of stock or share capital of another corporation. Stock, or share capital, unlike real or personal property, is not subject to being leased. The court specifically noted that it was not looking for acquisition of property, and its definitional statement must be read in the context of stock acquisition.

Ascertaining the meaning of the words "acquire" and "acquisition" in section 7 is aided by examining the nature of the object of the putative acquisition. The statute describes the object as "the whole or any part of the assets of another person." Does the lessee of an operating lease acquire assets of the lessor?

A lease is an agreement by which the lessor grants the lessee the right of possession and use of the leased property for a period of time. The possessory and use rights are, in most situations, very valuable rights in the bundle of rights constituting ownership. (The amount of the rental payments under the Nabisco-ADM lease certainly shows how valuable those rights are in this case.) The lessee has a leasehold, which is "the *asset* representing the right of the lessee to use leased property." (Emphasis supplied.) Black's Law Dictionary 801 (5th ed. 1979). A leasehold is clearly a property right in the leased assets.

Acquisition is "the act of becoming the owner of certain property; the act by which one acquires or procures the property in anything." *Id.* at 23.

■ A lessee of an operating lease certainly acquires property rights in the assets leased. Therefore, without even going

beyond the statutory language, it can be reasonably concluded that an operating lease is an acquisition of a part of the assets of another within the meaning of section 7. However:

> It is generally safe to say that [statutory] language is never so clear as to permit an unmistakable interpretation of its meaning from the bare words alone * *. [T]he better approach involves the identification of a purpose behind the statute and the interpretation of meaning in the light of such purpose * * *.

> Section 7 prohibits acquisitions which tend to lessen competition.

*International Telephone & Telegraph Corp. v. American Telephone & Telegraph Co.,* 444 F.Supp. 1148, 1152 (S.D.N.Y.1978). The "purpose" approach was applied by the United States Supreme Court in *United States v. Philadelphia National Bank, supra,* 374 U.S. at 342–43, 83 S.Ct. at 1730, and it was the approach of the United States District Court for the Southern District of New York in *United States v. Columbia Pictures Corp.,* quoted *supra.*

If an operating lease such as the Nabisco-ADM lease is not an acquisition within the meaning of section 7 of the Clayton Act, then the procompetitive purpose of section 7 can be frustrated by the adroit use of leases that do not meet the FASB Statement No. 13 criteria for a capital lease. If, for example, a firm in an industry leased most or all of its competitors' facilities for a period of ten years, there could be little doubt that the "effect * * * may be substantially to lessen competition, or to tend to create a monopoly" within the meaning of section 7 for those ten years. Construing section 7 to cover operating leases is not only consistent with the meaning of the terms involved—"acquire," "acquisition," "assets," "lease," "leasehold"— but it is the only construction that serves the procompetitive purpose of section 7.

Defendants rely on the fact that before the lease was entered into counsel for defendants made telephone inquiry of the Senior Attorney for the Federal Trade Commission's Premerger Office of the Bureau of Competition concerning whether the lease was reportable under section 7A of the Clayton Act, 15 U.S.C. § 18a, and regulations promulgated pursuant thereto, and the reply on the telephone was that the lease was not reportable. The lease was orally described; the record before this court does not reveal how detailed or accurate the description was. The parties to the lease and the industry were not identified. The Senior Attorney expressed no opinion on whether the lease was within the reach of section 7, and expressly stated that the fact that a transaction is not covered by section 7A did not mean that it did not violate the antitrust laws.[1]

■ The major purpose of section 7A is to provide advance notice to the FTC and the Antitrust Division before certain types of transactions are consummated. This permits the agencies to evaluate them and seek injunctions, if necessary, before the businesses and assets of the parties are combined. Section 7A, unlike section 7, is entirely procedural, and does not affect the substantive legal standards of section 7. Section 7A simply provides a reporting tool to assist the agencies in performing their responsibilities.

■ The Senior Attorney's answer that the lease was not reportable reflected Federal Trade Commission policy designed to avoid receiving premerger reports regarding routine leasing transactions.[2]

The informal telephone opinion of the Senior Attorney, viewed in the context of all of the circumstances, is not persuasive of defendants' contention that section 7 does not reach operating leases.

It is this court's conclusion that the Nabisco-ADM lease is an acquisition within

---

**1.** Declaration under penalty of perjury of Roberta Baruch, paragraph 8. This declaration was filed by the government on December 15, 1983, in connection with the pending motions,

and its factual contents are not contradicted by defendants.

**2.** Declaration of Roberta Baruch, paragraph 8.

the meaning of section 7 of the Clayton Act. This conclusion, of course, does not establish that the defendants are in violation of section 7 because the government still must prove at trial that "the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

### RULINGS AND ORDER

Defendants' motion for summary judgment is denied.

The government's motion for partial summary judgment is granted.

IT IS ORDERED that summary judgment be entered adjudicating that the lease dated June 12, 1982, constitutes an acquisition by defendant Archer-Daniels-Midland Company of part of the assets of defendant Nabisco Brands, Inc. within the meaning of section 7 of the Clayton Act, 15 U.S.C. § 18.

Pursuant to 28 U.S.C. § 1292(b), I hereby certify that I· am of the opinion that the order granting partial summary judgment involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of this litigation.