FEDERAL TRADE COMMISSION and The State of Georgia, Plaintiffs,

v.

PHOEBE PUTNEY HEALTH SYSTEM INC., Phoebe Putney Memorial Hospital, Inc., Phoebe North, Inc., Palmyra Park Hospital Inc., and Hospital Authority of Albany–Dougherty County, Defendants.

Case No. 1:11–cv–58 (WLS).

United States District Court, M.D. Georgia, Albany Division.

June 27, 2011.

**1358**

Edward D. Hassi, Goldie V. Walker, Joseph S. Brownman, Maria M. Dimoscato, Matthew K. Reilly, Matthew Tabas, Norman A. Armstrong, Oscar Voss, Peter C. Herrick, Priya Viswanath, Richard A. Feinstein, Scott Reiter, Thomas H. Brock, W. Stephen Stockwell, Jr., Willard K. Tom, Federal Trade Commission, Washington, DC, Sara Y. Razi, Federal Trade Commission, Pennsylvania Ave, NW, Stewart R. Brown, United States Attorney's Office, Macon, GA, Alex F. Sponseller, Isaac Byrd, Samuel Scott Olens, Sidney Ray Barrett, Jr., Atlanta, GA, for Plaintiffs.

Amy McCullough, Baudino Law Group, PLC, Emmet J. Bondurant, II, John Hinton Parker, Jr., Robert Michael Brennan, Frank M. Lowrey, IV, Michael A. Caplan, Ronan Patrick Doherty, Atlanta, GA, James C. Egan, Jr., Jonathan L. Sickler, Lee Kavel Van Voorhis, Washington, DC, Aimee H. Goldstein, Jennifer Rie, Kevin J. Arquit, Meryl G. Rosen, Nicholas F. Cohen, Paul C. Gluckow, New York, NY, Charles Edward Peeler, Flynn Peeler & Phillips, LLC, Karin A. Middleton, Baudino Law Group, PLC, Edgar Baughn Wilkin, Jr., Albany, GA, David J. Darrell, Robert J. Baudino, Jr., Des Moines, IA, for Defendants.

**PUBLISH**

SANDS, District Judge.

Before the Court are Plaintiffs Federal Trade Commission's (FTC) and State of Georgia's Motion for Preliminary Injunction (hereinafter "PI Motion") (Doc. 5); Hospital Authority of Albany–Dougherty County's ("the Authority")[1] Motion to Dismiss or Alternatively, for Summary Judgment and to Vacate the Temporary Restraining Order ("TRO") (Doc. 45); HCA,

---

1. The Authority, a hospital authority organized and existing under the Georgia Hospital Authorities Law, O.C.G.A. § 31-7-70 *et seq.*, owns Phoebe Putney Memorial Hospital, the hospital currently leased and operated by Phoebe Putney Health System, Inc. affiliate Phoebe Putney Memorial Hospital, Inc. (Doc. 2 ¶ 27).

Inc.'s ("HCA") and Palmyra Park Hospital, Inc.'s ("Palmyra")[2] Cross–Motion to Dismiss or Alternatively, for Summary Judgment and to Dissolve the TRO (Doc. 46); and Defendants Phoebe Putney Health System Inc.'s ("PPHS"), Phoebe Putney Memorial Hospital, Inc.'s ("PPMH"), and Phoebe North, Inc.'s ("PNI") (hereinafter collectively referred to as "Phoebe Putney")[3] Motion to Dismiss and Vacate the TRO (Doc. 53) (hereinafter collectively referred to as "Motions to Dismiss"). For reasons thoroughly set forth below, the Court **DENIES** Plaintiffs' Motion for Preliminary Injunction (Doc. 5), and **GRANTS** Defendants' Motions to Dismiss (Docs. 45, 46, 53)[4].

## PROCEDURAL and RELEVANT FACTUAL BACKGROUND

Pursuant to section 13(b) of the Federal Trade Commission Act (hereinafter "FTCA"), *see* 15 U.S.C. § 53(b),[5] and section 16 of the Clayton Act, *see id.* § 26,[6] on April 21, 2011, Plaintiffs commenced this suit and filed a Motion for a Temporary Restraining Order (TRO) and PI Motion, which is pending before the Court, seeking to temporarily as well as preliminarily enjoin Defendants, including their divisions, parents, subsidiaries, affiliates, partner-

---

2. HCA is a for-profit health system that owns Palmyra Park Hospital, Inc., which was created in 1973 and does business as Palmyra Medical Center, an acute care hospital incorporated in the State of Georgia. (Doc. 2 ¶¶ 25–26).

3. All Phoebe Putney Defendants are not-for-profit corporations under IRS Code § 501(c)(3) and the Georgia Nonprofit Corporate Code. PPMH, Inc. is a Georgia corporation wholly-owned by PPHS, also Georgia corporation, and was created to operate Phoebe Putney Memorial Hospital, which was founded in 1911. Like Palmyra, PPMH offers a full range of general acute care hospital services. (Doc. 2 ¶¶ 22–23). According to the Complaint, Phoebe North, Inc., is the entity created by PPHS in connection with the subject transaction to manage and operate Palmyra under the control of PPHS. (Doc. 2 ¶ 21).

4. Except where otherwise indicated, for concision and because Defendants make identical arguments in their supporting briefs, the instant Order often only cites to one of Defendants' supporting briefs instead of the briefs of all three Defendants. Similarly, this Order often only cites to one of Plaintiffs' briefs instead of both.

5. Section 13(b) of the FTCA reads, in pertinent part:

Whenever the Commission has reason to believe—

(1) that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission, and

(2) that the enjoining thereof pending the issuance of a complaint by the Commission and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final, would be in the interest of the public—

the Commission ... may bring suit in a district court of the United States to enjoin any such act or practice. Upon a proper showing that, weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond ...."

FTCA § 13(b), 15 U.S.C. § 53(b).

6. Section 16 of the Clayton Act permits

[a]ny person, firm, corporation, or association ... to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws ..., when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon ... a showing that the danger of irreparable loss or damage is immediate, ....

Clayton Act § 16, 15 U.S.C. § 26.

ships, or joint ventures, from consummating the completion of the alleged acquisition of Palmyra by Phoebe Putney. (*See* Doc. 2 at 1–2; *see also* Doc. 5 at 1–2). They base their Complaint on the following chronology of facts, which they, in turn, assert as grounds for the Court's grant of their PI Motion:

In July 2010, Joel Wernick, PPHS's President and CEO, authorized Robert Baudino, a consultant and attorney engaged by PPHS, to begin discussions with HCA regarding the possible acquisition of Palmyra by Phoebe Putney. (Doc. 2 ¶ 32). According to the Complaint, Baudino began negotiations on behalf of PPHS to acquire Palmyra in August 2010. (*Id.*). HCA's significant cash offer demand, however, made it difficult for PPHS to find an independent investment bank to issue a fairness opinion opining that the price required by HCA for Palmyra was fair. Consequently, Baudino proposed that the transaction be structured so that the Authority would acquire Palmyra, a solution that would also avoid the risk of antitrust enforcement, as demanded by HCA. (*Id.* ¶ 37). As proposed, the Authority would simply buy Palmyra, with PPHS guaranteeing the purchase price and the Authority's performance under the purchase agreement. (*Id.* ¶ 38). Once the Authority obtained title, it would lease Palmyra to PPHS for $1.00 per year for forty years on terms similar to the 1990 Lease between PPMH, Inc. and the Authority. (*Id.*).

On October 21, 2010, Wernick and Tommy Chambless, PPHS's general counsel, held a thirty-minute informational session with two of the Authority's members, Ralph Rosenberg and Charles Lingle. The entire Authority, however, was not presented with the proposed transaction until December 21, 2010, after PPHS made a formal offer to HCA for Palmyra on November 16, 2010; the PPHS Board approved the final terms of the deal between PPHS and HCA on December 2, 2010, including PPHS's guarantee of $195 million payment and agreement to pay a $35 million break-up fee and/or rescission fee; and PPHS and HCA entered into a Termination Agreement that required PPHS to pay $17.5 million if the Authority did not approve, in the exact form as negotiated, the Asset Purchase Agreement. (*Id.* ¶¶ 47–49).

At the December 21, 2010 special Authority meeting on the proposed transaction, Baudino, who appeared as special counsel to the Authority, presented the terms of the transaction using a presentation from PPHS's December 2, 2010 Board meeting. (Doc. 2 ¶¶ 37, 49). The members then voted to approve the Asset Purchase Agreement and the Termination Agreement, exactly as negotiated, Ex. PX008–04, as well as a Management Agreement between the Authority and Phoebe Putney. (*Id.* ¶ 50). Effective March 1, 2011, and set to "automatically terminate upon the effective date of [the putative] executed lease," the Management Agreement granted the entity formed by PPHS control over Palmyra's operations immediately upon the closing of the transaction. Ex. PX009 § 7.03(c). Several months later, on April 4, 2011, the Authority approved a lease term sheet prepared by Baudino that clarifies the December 21, 2011 Resolutions approved by the Authority as well as the Authority's plan to lease Palmyra's and PPMH's assets to Phoebe Putney under a single lease. (Doc. 2 ¶ 52).

On these facts, Plaintiffs assert in their Complaint and Memorandum in Support of their PI and TRO Motions that Phoebe Putney and the Authority have structured the subject transaction to avoid antitrust enforcement by the FTC through the sale of Palmyra to the Authority, the grant of management and operational control over Palmyra's assets to PPHS pursuant to the

Management Agreement, and the subsequent lease of Palmyra to a PPHS entity for forty years. (*Id.* ¶¶ 2–7). Thus, the acquisition of Palmyra—the acquirer of which Plaintiffs claim is the Authority only on paper but Phoebe Putney in reality—will create a virtual monopoly for inpatient general acute care services in Albany, Dougherty County, Georgia, by eliminating competition between PPMH and Palmyra, the only two major hospitals that service not only the Albany, Dougherty County community, but the communities of the surrounding six counties. (*Id.* ¶ 1).

Accordingly, Plaintiffs center their Complaint on the need for the Court to aid in the maintenance of the *status quo* during the FTC's ongoing administrative proceedings, which includes a September 19, 2011 trial on the merits of the legality of Phoebe Putney's alleged acquisition of Palmyra. (*See id.* ¶¶ 91–95; *see also* Doc. 7). They further maintain that Defendants are not entitled to state action immunity because the Authority was not sufficiently involved in the transaction, and PPHS, as a private party, entirely negotiated, structured, and executed the subject transaction without the independent analysis and oversight of the Authority. (*See* Doc. 2 ¶¶ 85–89). Injunctive relief, according to Plaintiffs, is therefore necessary and appropriate in this case to prevent competitive harm during the pendency of the FTC administrative proceedings. (Doc. 7 at 6–7).

In consideration of the foregoing factual allegations and assertions, the Court granted Plaintiffs' Motion for TRO (Doc. 4) on April 22, 2011 (Doc. 9).[7] Approximately a month thereafter, Defendants filed their Motions to Dismiss,[8] wherein they argue

---

**7.** The Court's grant of temporary injunctive relief has been extended, pursuant to Defendants' consent, until the Court's issuance of a decision on the pending PI Motion.

**8.** Defendants HCA, Palmyra, and the Authority alternatively move for summary judgment in their Motions to Dismiss. (The Phoebe Defendants only move to dismiss and vacate the TRO.) However, the Court construes Defendants HCA's, Palmyra's, and the Authority's Motions as motions to dismiss instead of ones for summary judgment because the Court's findings and conclusions herein with respect to the state action immunity issue are made without reference to matters outside of the pleadings. *Harper v. Lawrence County, Ala.*, 592 F.3d 1227, 1232 (11th Cir.2010) ("A judge need not convert a motion to dismiss into a motion for summary judgment as long as he or she does not consider matters outside the pleadings."). And to the degree the Court has referred to matters beyond the pleadings that are attached to Defendants' Motions to Dismiss—for example, the Asset Purchase Agreement, Management Agreement, and documents concerning the negotiations for the transaction—the Court is permitted to do so because these matters are (1) central to the complaint and (2) undisputed. *See Horne v. Potter*, 392 Fed.Appx. 800, 802 (11th Cir. 2010) (citing Fed.R.Evid. 201). For this rea-

son, Defendants' Motion to Strike (Doc. 73) Plaintiff FTC's Statement of Undisputed Material Facts (Doc. 64) is **DENIED**, for the decision herein does not reference or rely on the FTC's or Defendants' Rule 56 Statements.

For this reason, the Court also **OVERRULES** the Authority's objection to the exhibits that Plaintiffs moved to admit into evidence at the close of the June 13, 2011 hearing on Defendants' Motions to Dismiss and Plaintiffs' PI Motion. The Authority contends that these exhibits are irrelevant to Defendants' Motions to Dismiss because they do not deal with the state action defense; rather, the Authority asserts, they deal with Plaintiffs' application for a preliminary injunction. The Court finds, however, that these documents are relevant to the state action defense in that they provide context for the Court's assessment of the transaction, specifically whether Defendants' actions qualify for state action. Furthermore, all of the documents on Plaintiffs' Exhibit List on which the Court's analysis relies are referenced in the Complaint, which is the only focus of a Court's ruling on a motion to dismiss. Finally, many of the most relevant documents to which the Authority objects—and all of the documents relied on by the Court—were previously filed by Plaintiffs as well as Defendants—for example, the 1990 Lease—or were provided to Defendants.

that the state action doctrine indisputably immunizes their conduct from antitrust scrutiny and thereby moots Plaintiffs' PI Motion and require its denial. (*See generally* Docs. 45–46, 53). To Defendants, the Authority's acquisition of Palmyra as documented in the Asset Purchase Agreement is state action that is immune from the federal antitrust laws. (Doc. 45–1 at 19).

After a day-long hearing on June 13, 2011, on Plaintiffs' PI Motion and Defendants' Motions to Dismiss, said Motions are left pending for the Court to decide. The Parties have fully briefed the issues surrounding Plaintiffs' request for preliminary injunctive relief and Defendants' request for dismissal—namely, state action antitrust immunity. Before assessing the substance of the Parties' arguments in the context of the relevant law, the Court first must resolve a preliminary dispute between the Parties concerning the scope of issues for the Court's review under section 7 of the Clayton Act. It then turns to Defendants' Motions to Dismiss (Docs. 45, 46, 53)—specifically, the potential application of state action to the Authority, Phoebe Putney, and HCA/Palmyra—and if the Court finds that state action is inapplicable, to Plaintiffs' PI Motion (Doc. 5).

## DISCUSSION

### I. *Defendants' Motions to Dismiss*

#### a. **Standard of Review**

In light of Defendants' asserted antitrust immunity, Defendants' Motions to Dismiss are brought pursuant to Fed. R.Civ.P. 12(b)(6)[9] for what Defendants contend is Plaintiffs' failure to state claims against Defendants for violations of the

Clayton Act and FTCA. (*See* Docs. 45, 46, 53). As a defense to a claim for relief in any pleading, Rule 12(b)(6) may be raised as a motion to dismiss. *See* Fed.R.Civ.P. 12(b)(6). Such a motion should not be granted unless the plaintiff fails to plead enough facts to state a claim to relief that is plausible, and not merely just conceivable, on its face. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). The recent Supreme Court decision of *Ashcroft v. Iqbal* reaffirmed the pleading standards enunciated in *Twombly.* 556 U.S. 662, 129 S.Ct. 1937, 1949–54, 173 L.Ed.2d 868 (2009). There, the Supreme Court instructed that while on a motion to dismiss "a court must accept as true all of the allegations contained in a complaint," this principle "is inapplicable to legal conclusions," which "must be supported by factual allegations." *Id.* at 1949–50 (citing *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955, for the proposition that courts "are not bound to accept as true a legal conclusion couched as a factual allegation" in a complaint).

In other words, "[a] motion to dismiss is granted only when the movant demonstrates 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Spain v. Brown & Williamson Tobacco Corp.,* 363 F.3d 1183, 1187 (11th Cir.2004) (citation omitted). In evaluating the sufficiency of a plaintiff's pleadings, while the court must "accept[ ] the allegations in the complaint as true[,] constru[e] them in the light most favorable to the plaintiff," *Hill v. White,* 321 F.3d 1334, 1335 (11th Cir. 2003), and "make reasonable inferences in

---

9. Defendants also move to dismiss pursuant to Fed.R.Civ.P. 12(b)(1) for lack of subject matter jurisdiction, seemingly asserting that because the state action doctrine immunizes Defendants from antitrust laws, the Court lacks federal subject matter jurisdiction to hear Plaintiffs' Complaint. Defendants' Mo-

tions to Dismiss, however, are more appropriately grounded in 12(b)(6), instead of in Rule 12(b)(1), as they require the Court to review the sufficiency of the pleadings. As such, the Court's review of Plaintiffs' Complaint is governed by Rule 12(b)(6) standards.

[p]laintiff's favor, '... [the court is] not required to draw plaintiff's inference,'" *Sinaltrainal v. Coca–Cola Co.*, 578 F.3d 1252, 1260 (11th Cir.2009) (quoting *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1248 (11th Cir.2005)). Thus, although the "threshold of sufficiency that a complaint must meet to survive a motion to dismiss for failure to state a claim is ... exceedingly low[, it is not nonexistent]." *Ancata v. Prison Health Servs. Inc.*, 769 F.2d 700, 703 (11th Cir. 1985) (citation and quotation marks omitted). In view of these legal standards applicable to the pleading stage, the Court now turns to its discussion of a preliminary issue concerning the scope of its review, and then addresses Defendants' state action argument in opposition to Plaintiffs' Complaint and PI Motion.

### b. The Meaning and Scope of the Alleged Transaction

The Parties differ as to the events constituting the "transaction" that Plaintiffs contend violate antitrust laws under section 7 of the Clayton Act. As a result, the parameters of the conduct to which the state action immunity exception may apply are blurred. Plaintiffs allege that the acquisition includes three stages: (1) the Authority's purchase of Palmyra's assets from HCA using PPHS's money, (2) the Authority's immediate provision of control of Palmyra to Phoebe Putney, specifically PNI, under a Management Agreement, and (3) Phoebe Putney's entry into a lease with the Authority to grant Phoebe Putney managerial control of Palmyra assets for forty years. (Doc. 2 at 2).

In contrast, Defendants contend that the first stage of the alleged transaction is the only event relevant to the Court's analysis of the state action immunity issue. Thus, they contest the inclusion of the third stage as part of an "acquisition" subject to antitrust review. This third stage, particularly with respect to the alleged lack of adequate supervision by the Authority of Phoebe Putney's control of Palmyra operations, is "speculative," Defendants maintain, because the lease and its terms do not yet exist and have not even been negotiated. (*See* Docs. 45–47, 53 (arguing that Article III of the U.S. Constitution prohibits Court from enjoining Authority's acquisition of Palmyra based on non-existent lease)). Moreover, Defendants argue that neither the putative lease nor the Management Agreement is alleged to have competitive impact beyond the acquisition of Palmyra itself by the Authority. (Doc. 75 at 6). Accordingly, they also seemingly contest the inclusion of the second stage regarding the Management Agreement as part of the "acquisition" subject to antitrust review because it is unexecuted. (*See, e.g.*, Doc. 47–2 at 14).

■ Section 7 of the Clayton Act provides, in pertinent part, "no person subject to the jurisdiction of the [FTC] shall acquire the whole or any part of the assets of another person ..., where ... the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."[10] 15 U.S.C. § 18. "[W]hen it prohibited the acquisition of the whole or any part of the assets of another corporation," "Congress was painting with a broad brush...." *United States v. Archer–Daniels–Midland Co.*, 584 F.Supp. 1134, 1137 (S.D.Iowa 1984) (emphases added) (quoting *United States v. Columbia Pictures*

---

**10.** Section 7 also applies to stock or share capital acquisitions. *See* 15 U.S.C. § 18. Many nonprofit entities like Phoebe Putney and Palmyra, however, have no stock or share capital to acquire. This part of section 7 is therefore inapplicable to many acquisitions of nonprofit enterprises such as the one at issue here. *FTC v. Univ. Health, Inc.*, 938 F.2d 1206, 1214 n. 14 (11th Cir.1991) (finding inapplicable stock-acquisition clause of section 7 to acquisition of nonprofit hospital).

*Corp.*, 189 F.Supp. 153, 181–82 (S.D.N.Y. 1960)). As such, section 7 has been construed as forward looking: unlawful conduct triggers the provision's protections as soon as the potential anticompetitive results can be detected. *Cine 42nd Street Theater Corp. v. Nederlander Org., Inc.*, 790 F.2d 1032, 1040 (2d Cir.1986) ("[The Clayton Act's] focus is ... on the future, ... whether today's acquisition will bring tomorrow's loss of competition.").

Language on the breadth of section 7 from a popularly quoted case from a court in the Southern District of Illinois is particularly instructive:

> [section 7] is primarily concerned with the end result of a transfer of a *sufficient part of the bundle of legal rights and privileges from the transferring person to the acquiring person to give the transfer economic significance and the proscribed adverse "effect."*
>
> The broad sweep to be given to the term "acquire" is also suggested by the circumstance that the following words are unrestricted, i.e., "the whole or any part of the assets." ... Those words likewise must be given a *liberal interpretation* ...
>
> The language [of section 7] was deliberately couched in *general and flexible* terms....

*Archer–Daniels–Midland Co.*, 584 F.Supp. at 1137 (emphases added) (quoting *Columbia Pictures Corp.*, 189 F.Supp. at 181–82). Thus, as one court in the Northern District of Georgia held, "[t]he words 'acquire' and 'assets' are not terms of art or technical legal language[, but] ... are generic, imprecise terms encompassing a *broad spectrum* of transactions whereby the acquiring person may accomplish the acquisition by means of *purchase, assignment, lease, license,* or otherwise." *See S. Concrete Co. v. U.S. Steel Corp.*, 394 F.Supp. 362, 374 (N.D.Ga.1975) (emphases added) (quoting *Columbia Pictures Corp.*, 189 F.Supp. at

181–82). Therefore, "[t]he test [for whether an acquisition falls under section 7] is pragmatic,...." *Archer–Daniels–Midland*, 584 F.Supp. at 1137 (quoting *Columbia Pictures Corp.*, 189 F.Supp. at 181–82).

Courts have consequently found the consummation of an acquisition unnecessary for a Clayton Act violation; a planned acquisition created by the parties' entry into an agreement is sufficient. *Nelson v. Pacific Southwest Airlines*, 399 F.Supp. 1025, 1027 (S.D.Cal.1975). Accordingly, courts have applied the term "acquisition" to a wide variety of transactions, including putative and ongoing leases. *See, e.g., Cine 42nd Street*, 790 F.2d at 1047–48 (indicating that lease of property by private parties, as approved by city and urban development corporation, constituted "acquisition" under Clayton Act); *Archer–Daniels–Midland Co.*, 584 F.Supp. at 1137–38 (construing operating lease as acquisition within reach of section 7, as lessee of operating lease acquires property rights of possession and use in leased assets); *Nelson*, 399 F.Supp. at 1028–1030 (holding that despite abandonment of agreement for acquisition between parties, acquirer's ability to have gained substantial control over decision-making process of airline during pendency of acquisition agreement created genuine issue of threat of acquirer's purchase of corporation's controlling of stock in airline to airline transportation competition). Such broad applications of section 7 are sensible in light of the Clayton Act's purpose to prevent acquisitions that "may" or "tend to" cause specified harm. *Gottesman v. General Motors Corp.*, 414 F.2d 956, 961 (2d Cir. 1969) (explaining that acquisitions that directly bring about harm or that even make possible acts that do, can violate Clayton Act).

 Based on the above rationale, this Court finds that the inchoate or unexecut-

ed nature of the subject transaction should not limit this Court's review. The putative lease alleged in Plaintiffs' Complaint should constitute a part of the subject "acquisition" and therefore part of the transaction that this Court must review and assess. According to the well-pleaded allegations of the Complaint, the moment the acquisition by the Authority is consummated, all Dougherty County hospital competition will cease and Phoebe Putney will be able to control Palmyra assets pursuant to the Management Agreement.

Following the consummation of the sale to the Authority and execution of the Management Agreement between the Authority and PPHS, any additional steps that any Defendant takes such as the execution of the lease agreement—no matter the number of months and steps required before such a lease may be created and executed—are in furtherance of the alleged merger to monopoly and thus, the transaction. In fact, if it were not for the Court's grant of Plaintiffs' Motion for TRO to block the acquisition, Defendants would have proceeded with their plans to consummate the acquisition; execute the Management Agreement for Phoebe Putney's maintenance and operation of Palmyra's assets; and begin steps to negotiate, draft, and execute the purported lease of Palmyra to Phoebe Putney.

In effect, therefore, along with the acquisition of Palmyra by the Authority, the lease, which will follow the execution of the Management Agreement under which Phoebe Putney will immediately control Palmyra assets, makes possible the alleged harm of the acquisition on hospital competition in the relevant market of Albany, Dougherty County, Georgia. The inclusion of the lease stage in the Court's re-

view of the "acquisition" is consistent with the court's finding in *Nelson* that a terminated acquisition agreement, which was never executed, fell within the purview of section 7. It also comports with *Cine 42nd Street's* decision to implicitly construe a lease granted to private parties as an acquisition under the Clayton Act. It is the mere alleged plausibility that Phoebe Putney could achieve control of the decision making processes of Palmyra, its only competitor—even through an unexecuted Management Agreement and unnegotiated lease arrangement with the Authority—that triggers the Clayton Act.

Several documents referenced in the Complaint, including a Memorandum on the Required Terms for a Revised Lease between the Authority and PPMH, Inc., as well as the Resolutions adopted by the Authority at the December 21, 2010 special meeting, indicate that Phoebe Putney and the Authority intended to draft a lease for PPHS's control of Palmyra. *See, e.g.,* Ex. PX0082. One of the Resolutions adopted by the Authority states that Phoebe Putney and the Authority would enter into a lease for the operation of Palmyra by Phoebe Putney on terms substantially similar to those of the 1990 Lease between PPMH, Inc. and the Authority for PPMH's operation.[11] *See* Ex. PX0082. Additionally, the applicable provisions of the Hospital Authorities law, *see infra* note 16 & Part I.c.ii.1.a, and controlling legal authority within this Circuit indicate that an arrangement for an acquisition and/or lease between a hospital authority and private hospital similar to the arrangement between the Authority and Phoebe Putney is often necessary, given an authority's inability to operate for profit and thus, its

---

11. On November 10, 2010, Baudino, acting as special counsel to PPHS, also detailed this proposition in a six-page letter to HCA, which explained that the Authority would "lease Pal-

myra to a non-profit entity controlled by PPHS ... [on] substantially the same terms as the Authority's existing lease of [PPMH]." Ex. PX207–02.

lack of offices, staff, and funds; and an authority's statutory power to delegate to other entities, even those private in nature, its responsibility to provide healthcare to the community.

For all of the above reasons, the Court similarly finds no reason to exclude the Management Agreement from the purview of the alleged "transaction," as the Authority's approval of the Management Agreement represents the "transfer of a sufficient part of the bundle of legal rights and privileges [in Palmyra] from [the Authority, the owner, as lessor,] to [Phoebe Putney, as lessee,] to give the transfer economic significance and the prescribed adverse 'effect'" under the Clayton Act. See Archer–Daniels–Midland Co., 584 F.Supp. at 1137 (quoting Columbia Pictures Corp., 189 F.Supp. at 181–82). These facts, coupled with the approximately $200 million Phoebe Putney has guaranteed for the transaction, remove the lease of Palmyra to PPHS by the Authority from the speculative realm into the realistic. Accepting the truth of these allegations, as the Court is required to do at this pleading stage, the Court rejects Defendants' narrow view of the breadth of section 7 that excludes the purported second and third stages of the transaction.

### c. State Action Immunity

Having determined the scope of the transaction that is subject to the Court's review, the Court is left to resolve the issue of Defendants' asserted entitlement to state action immunity. In their Motions to Dismiss, all six Defendants argue that the Authority's acquisition of Palmyra, as well as any subsequent lease of Palmyra to Phoebe by the Authority, triggers state action; thereby immunizes the subject transaction from antitrust laws; and requires the dismissal of Plaintiffs' Complaint, the denial of Plaintiffs' PI Motion, and an order vacating the TRO. (Doc. 45–1 at 4, 7, 13, 17). Defendants base this

proposition on the proposed transaction's satisfaction of all three elements of the state action immunity doctrine. (See id. (analogizing and relying on FTC v. Hosp. Bd. of Directors of Lee County, 38 F.3d 1184 (11th Cir.1994); Crosby v. Hosp. Auth. of Valdosta & Lowndes County, 93 F.Supp. 1515 (11th Cir.1996))).

As to the Authority's immunity, they contend that (1) the Authority is a political subdivision of the state; (2) Georgia state statutes authorize the Authority to acquire other hospitals as part of its authority to operate, control, and maintain a public hospital and other hospital facilities; and (3) the anticompetitive effect of the Authority's acquisition is reasonably foreseeable by the Georgia state legislature, given the express acquisition powers broadly conferred by the Georgia legislature to hospital authorities. (Id. at 4–5, 17–18, 21–23). According to Defendants, because a hospital authority can operate only within its sponsoring city or county, the Georgia legislature certainly knew that any acquisition was likely to be of a competing local hospital and that intra-county acquisitions would often result in the combination of two or more hospitals in a single county. (Id. at 21 (citing O.C.G.A. § 31–7–71(1))). Because such a conclusion flowed from similar express acquisition, operational, and management powers conferred on Florida hospital authorities by the Florida legislature in Lee County, the same conclusion logically flows from the powers legislatively granted to Georgia hospital authorities to acquire and operate hospitals. (Id.).

Defendants further argue that the actions of HCA, Palmyra, and Phoebe Putney are also immune from antitrust laws. As private parties that contract with a political subdivision of the state such as the Authority, they contend that HCA and Palmyra are immune under state action

immunity doctrine by extension, and Phoebe Putney, as a non-profit affiliated with the Authority, does not require active supervision by the state. (*See, e.g.,* Doc. 53–1 at 14). Defendants state, as a result, that an antitrust plaintiff challenging the act of a public hospital authority cannot avoid the state action doctrine by re-characterizing the transaction as one between private parties (in this case, as a sale from Palmyra to Phoebe Putney) (Doc. 75 at 3) and thus, cannot argue that the transaction is a mere pretext to advance private, anticompetitive interests rather than the public good (Doc. 45–1 at 25 to 26 (citing *City of Columbia v. Omni Outdoor Advertising, Inc.,* 499 U.S. 365, 369–70, 111 S.Ct. 1344, 113 L.Ed.2d 382 (1991))).

Once the state action doctrine is established, Defendants argue, the individual motives underlying the transaction—specifically, Phoebe Putney's financial interests in acquiring Palmyra—become irrelevant. (Doc. 45–1 at 25 to 27; *see also* Doc. 72 at 3 ("[There is simply no point at which] the influence of a private actor becomes so great that that ... the state doctrine [does not] appl[y].")). Rather, the fact that the Authority is the only entity acquiring Palmyra, as determined from a plain reading of the Asset Purchase Agreement, confirms that the transaction is immune from antitrust laws under the state action doctrine. (Doc. 75 at 4).

Phoebe Putney goes further to state that because no Phoebe entity is the buyer of the assets underlying Plaintiffs' allegations, only the Authority will own Palmyra and will have ultimate responsibility for its operation.[12] (Doc. 53–1 at 17). Thus, it maintains that "there is no cause of action involving a private actor" in this case. (*Id.*). According to Phoebe Putney, PPHS has neither the ability nor the incentive to engage in actions for its private benefit given that it must function as a non-profit and in a way that furthers state policy and that all Palmyra assets, like the current ownership of all PPMH assets, will be owned by the Authority. (*Id.* at 19). Thus, active supervision of Phoebe Putney by the Authority is unnecessary to conclude that state action applies in this case, argues Phoebe Putney. (*Id.* at 18–19 ("PPMH's interests are completely aligned with, and controlled by, the interests of the Authority and the State.")).

And even if active supervision does apply, Phoebe Putney argues that "the existing longstanding lease terms between PPMH and the Authority, plus the Authority's recent resolution to lease Palmyra only if it contains certain terms that clearly constitute active supervision under the relevant law, is sufficient." (*Id.* at 20). Lastly, Phoebe Putney as well as HCA, Palmyra, and the Authority argue that under the *Noerr–Pennington* doctrine, the only "conduct" alleged against Phoebe Putney is legally and constitutionally protected petitioning of a government entity under the First Amendment of the U.S. Constitution. (Doc. 53 at 2; Doc. 53–1 at 12 to 13; *see also* Doc. 45–1 at 6, 26 to 27, 35).

In response, Plaintiffs argue that the state action defense to antitrust enforce-

---

**12.** Phoebe Putney as well as the Authority and HCA/Palmyra, who join Phoebe Putney in this argument, assert a number of other grounds for this proposition, including the Court's lack of jurisdiction over non-profit entities. (*See* Docs. 45, 46). However, the Court does not address those arguments given its discussion of the application of the relevant state action tests to each Defendant. *See infra* Part I.c.ii.

The Court also must note that non-profit entities are subject to section 7 and thus, FTC jurisdiction. *See Univ. Health, Inc.,* 938 F.2d at 1215, 1216 (explaining congressional intent for FTC's expansive and vigorous enforcement of section 7 of Clayton Act, regardless of distinction between type of corporation); *see also supra* note 10.

ment cannot be invoked by Defendants for several reasons. First, according to Plaintiffs, Defendants have failed to discuss or even mention the standards of review applicable to a motion to dismiss, as they fail to construe all facts in a light most favorable to Plaintiffs.[13] (Doc. 61 at 9–10, 17). Second, Plaintiffs state that the transaction is an undisguised attempt to apply "a cloak of state involvement to a de facto merger to monopoly," thereby eliminating Defendants' ability to immunize their action from antitrust scrutiny. (*Id.* at 17, 20; *see also* Doc. 62 at 19).

As to the Authority, Plaintiffs contend that although the Authority is a political subdivision of state, Georgia Hospital Authorities Law does not authorize the usurpation of the decision and supervision powers of an authority by private actors for the private actor's benefit and without meaningful oversight by an authority. (Doc. 62 at 8–9, 12, 18–19; *see also* Doc. 7 at 21, 22–23). Thus, Plaintiffs maintain that the Authority cannot be considered to have acted pursuant to state policy authorized by the state legislature, and the displacement of private competition by Palmyra's sale to the Authority and subsequent lease by Phoebe Putney cannot be considered to be reasonably foreseeable by the Georgia legislature. (*See* Doc. 7 at 21–23 (distinguishing *Lee County*, 38 F.3d 1184, and *Askew v. DCH Reg'l Health Care Auth.*, 995 F.2d 1033, 1040–41 (11th Cir.1993), because law at issue in *Lee County* was "special act[ ]" of Florida Legislature that applied to that specific

county's health system, and health care authorities act in *Askew* expressly exempted authorities whose exercise of their authorized powers resulted in anticompetitive activities)).

As to Phoebe Putney, Plaintiffs contest the ability of the Phoebe entities, as private parties, to show that (1) the challenged transaction was clearly articulated and affirmatively expressed as state policy, and (2) that such policy was actively supervised by the state, so as to receive state action immunity. (Doc. 7 at 21–24; *see also* Doc. 61 at 20). They base this contention on the role of Phoebe Putney, and not the Authority, as the effective decision maker in planning, funding, and executing the transaction. (Doc. 7 at 7). In support thereof, Plaintiffs highlight the Authority's lack of meaningful review of the acquisition, failure to acknowledge the transaction until shortly before the day of its approval, and failure to ask questions during the presentation of the transaction. (*Id.* at 8–12). Plaintiffs further note that the Resolutions for the transaction for the Authority's approval were prepared by Phoebe Putney for the Authority members' signatures. Such conduct by Phoebe Putney, according to Plaintiffs, was beyond the type of state action that may qualify for antitrust immunity. (Doc. 62 at 9). As to HCA and Palmyra, they contend that a mere contract with the state does not immunize private conduct.[14] (Doc. 61 at 23).

The foregoing dispute between the Parties as to the application of state action

---

**13.** Plaintiffs also state that Defendants do not apply the correct standard of review for summary judgment because Plaintiffs fail to raise undisputed material facts. However, as previously noted, the Court does not resolve Defendants' Motions to Dismiss as ones for summary judgment but as ones to dismiss. *See supra* note 8. Thus, the Court does not need to apply the standards applicable at the summary judgment stage and thus, declines to

consider Plaintiffs' allegations and Defendants' arguments within the context of summary judgment.

**14.** For purposes of deciding the application of state action immunity to Defendants, the Court combines its assessment of the immunity of Phoebe Putney with that of HCA/Palmyra for reasons explained below. *See infra* note 21 and accompanying text.

immunity raises the following central question for the Court to resolve: whether the Authority's approval of the acquisition as negotiated and structured by Phoebe Putney is sufficient to shield the transaction from antitrust scrutiny under the state action immunity doctrine. Pursuant to the Court's conclusion as to the scope of the subject "acquisition," *see supra* Part I.b., and Phoebe Putney's role in bringing about and executing the transaction, this question must be answered as to the *Authority's* conduct as well as to *Phoebe Putney's* and HCA–Palmyra's conduct. Such an analysis begins with an exploration of the controlling and authoritative case law on state action immunity.

### i. *U.S. Supreme Court and Eleventh Circuit Case Law on State Action Immunity*

The origins of the state action doctrine derive from the reasoning of the U.S. Supreme Court's decision in *Parker v. Brown.* *See* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). In *Parker,* relying on principles of federalism and state sovereignty,[15] the Supreme Court refused to construe the Sherman Act as applicable to the anticompetitive conduct of a state acting through its legislature—specifically a marketing program adopted for the 1940 raisin crop by the California Director of Agriculture. *Id.* at 350–51, 63 S.Ct. 307. The marketing program was adopted pursuant to the California Agricultural Prorate Act, which authorized state officials to establish marketing programs of agricultural commodities in the state to restrict competition among growers and to main-

tain prices in the distribution of their commodities to packers. *Id.* at 346, 63 S.Ct. 307.

Although the establishment of the challenged marketing program, approved by the Prorate Advisory Commission, was initially petitioned by private producers and was approved by referendum of producers, the Court found that "the state ... ha[d] created the machinery for establishing the prorate program." *Id.* at 346–47, 352, 63 S.Ct. 307. "The prerequisite approval of the program upon referendum by a prescribed number of producers [wa]s not the imposition by them of their will upon the minority by force of agreement or combination ....."; rather, the required vote on the referendum was one condition of the application of the regulations enacted and prescribed by the state under the enabling language of the Agricultural Prorate Act. *Id.* at 352, 63 S.Ct. 307 (citation omitted). According to *Parker,* therefore, the Sherman Act—and by extension, the Clayton Act—is not meant to restrain acts of the state that are directed by the legislature. *Id.* at 350–51, 63 S.Ct. 307; *see also Lee County,* 38 F.3d at 1186 (holding that state action doctrine is available under Clayton Act).

Several years later, in *Cal. Retail Liquor Dealers Assoc. v. Midcal Aluminum, Inc.,* the U.S. Supreme Court extended the parameters of *Parker* to apply to alleged restraints of trade brought about by *private actors.* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980). There, the Court held that to qualify private action for state ac-

---

**15.** *Cine 42nd Street* explained the conflict between these principles and a competitive free market that are raised by a state's attempt to anticompetitively regulate its own domestic economy under the shield of state action immunity. Principles of federalism and state sovereignty, embedded in the United States' federalist system, hold that states are sovereign powers and are entitled to act independently, even where such leads to anticompetitive economic activity. The tenet surrounding the free market, however, is that the U.S. economy is grounded on the free enterprise system and that anticompetitive economic activity is prohibited by antitrust law. *Cine 42nd Street,* 790 F.2d 1032, 1035 (2d Cir. 1986).

tion immunity, the challenged action first "must be 'one clearly articulated and affirmatively expressed as state policy;' [and] second, ... must be 'actively supervised' by the State itself." *Id.* at 105, 100 S.Ct. 937 (quoting *City of Lafayette v. La. Power & Light Co.*, 435 U.S. 389, 410, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978)).

Applying these elements to the wine pricing scheme established by private wine producers under the California Business and Professionals Code, the Court found that although the relevant provisions of the state Code represented a policy to permit the price resale maintenance by California wine sellers, the price setting program did not meet second requirement of *Parker* immunity because the state merely authorized price setting, enforced prices established by private parties, and never reviewed the reasonableness of price schedules or regulated the terms of the fair trade contracts. Simply put, the wine producers held the power to prevent price competition by dictating the prices charged by wholesalers, while the state played a passing, indirect role in pricing and management that was insufficient to establish antitrust immunity. *Id.* at 103–04, 100 S.Ct. 937 (explaining that without extensive official oversight by state, *Parker*, 317 U.S. at 351, 63 S.Ct. 307, may have found violation of Sherman Act).

■ Since *Parker* and *Midcal*, the Supreme Court and Eleventh Circuit have determined that state action immunity is applicable to political subdivisions such as municipalities, *City of Columbia*, 499 U.S. 365, 111 S.Ct. 1344, and hospital authorities, *Lee County*, 38 F.3d at 1188 (applying *Parker* immunity to Florida hospital authority); *Askew*, 995 F.2d at 1039 (same as to Alabama hospital authority). Yet, the determination that a political subdivision's anticompetitive activities constitute state action "is not a purely formalistic inquiry" that a party can establish by simply de-

claring the political subdivision's actions to be lawful. *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 39, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985).

■ Nonetheless, anticompetitive effects can result from broad authority to regulate. *Id.* In fact, "the [political subdivision] need not 'be able to point to a specific, detailed legislative authorization' in order to assert a successful *Parker* defense to an antitrust suit," as a requirement for such explicit authorization would unnecessarily impose on municipalities' local authority and autonomy. *Id.* at 39, 42, 44, 105 S.Ct. 1713 (finding that state statute broadly empowering cities to provide sewage services and to refuse to provide sewage services to unannexed areas clearly contemplated that city could engage in anticompetitive conduct that would result in monopoly over provision of sewage services).

■ Rather, to obtain protection under state action immunity doctrine, a political subdivision of the state must "demonstrate that their anticompetitive activities were authorized by the state 'pursuant to state policy to displace competition with regulation or monopoly public service.'" *Bolt v. Halifax Hosp. Med. Ctr.*, 980 F.2d 1381, 1385 (quoting *Town of Hallie*, 471 U.S. at 38–39, 105 S.Ct. 1713). This requires proof of the challenged action (1) by a political subdivision of the state, (2) undertaken pursuant to state statutes authorizing the challenged action, (3) the anticompetitive effects of which are reasonably foreseeable to the legislature based on the statutory power granted to the political subdivision. *Id.* at 1386.

#### 1. Immunity of Hospital Authorities

Here, Plaintiffs do not contest the Authority's satisfaction of the first and second elements of state action immunity, nor does the Court reject Defendants' conten-

tion that these items have been met. It is well established that the Authority is a political subdivision of the state under Eleventh Circuit law. *See Crosby*, 93 F.3d at 1525 (treating Hospital Authority of Valdosta and Lowndes County, Georgia, as Georgia political subdivision). The Georgia Code also authorizes Defendants to perform the challenged conduct of acquiring and leasing hospital property for purposes of meeting the healthcare needs of the community.[16]

For this reason, the Court's analysis as to the Authority's immunity hinges on the third element: whether the suppression of competition in the manner alleged in the Complaint is a reasonably foreseeable result of the conduct authorized and the powers granted to the Authority under Georgia Hospital Authorities law. To answer this question in the affirmative, the Court must be satisfied that the Georgia legislature reasonably foresaw a private entity taking managerial and operational control of its only former competitor through a management agreement and lease granted to it by a hospital authority following the authority's acquisition of that competitor.

In *Lee County*, the primary authority on which Defendants rely in their Motions to Dismiss, the Eleventh Circuit easily found this element met, even without an "explicit[ ] [statement by the legislature] that it expect[ed] anticompetitive conduct to re-

sult from [the subject] legislation." 38 F.3d at 1188 (citing and quoting *Town of Hallie*, 471 U.S. at 41–43, 105 S.Ct. 1713; *Askew*, 995 F.2d at 1040–41); *see also Askew*, 995 F.2d at 1040, 1041 (explaining that although enabling legislation, unlike that in *Lee County*, explicitly recognized potential anticompetitive results of state code's provision of broad acquisition and operational powers to healthcare authority, court was not required to find such explicit language to render such results foreseeable). The court held that the Florida legislature foresaw possible anticompetitive effects of the Hospital Board of Directors of Lee County's ("The Board") proposed in-county purchase of a private nonprofit hospital, Cape Coral Medical Center, Inc., when the state legislatively authorized the Board to make acquisitions of medical facilities and to own general acute care hospitals in Lee County. *Lee County*, 38 F.3d at 1186.

According to the Court, only one hospital, Lee Memorial Hospital, existed in Lee County when the Board was created in 1963; once authorized by the 1963 legislation, the Board's purchase of the hospital thereby created a monopoly. *Id.* Thus, when the Board's power was legislatively extended in 1987 to permit it to "*establish* and *provide for* the *operation and maintenance* of additional hospitals ... and other facilities devoted to the provision of health-

---

**16.** O.C.G.A. § 31–7–75(4) and (6), respectively, authorize a hospital authority to acquire by lease, purchase, or otherwise, and to sell to others or lease to others for any number of years not to exceed forty, any land, buildings, structures, or facilities constituting any part of an existing or future project, O.C.G.A. § 31–7–75(4), (6), (7), which includes "the *acquisition*, construction, and *equipping of* hospitals, health care facilities, ... and other public health facilities ... under the supervision and control of any hospital authority or leased by the hospital authority for operation by others to promote the public health needs

of the community ...," O.C.G.A. § 31–7–71(4) (emphases added). Section 31–7–75(7) also authorizes a hospital authority to lease for any number of years not to exceed forty for the operation of any project by another, provided that authority determines that lease will promote public health needs of community by making additional facilities available or reducing healthcare costs, and that authority retains sufficient control over any project so leased so as to ensure that lessee will not in any event receive more than reasonable rate of return on its investment in the project. *Id.* § 31–7–75(7).

care services" in Lee County only, the court held that the legislature must have reasonably anticipated that further acquisitions would increase the Board's market share in an anticompetitive manner. *Id.* at 1186, 1192 (emphases added) (quoting Florida Special Laws (citation omitted)).

Similarly, in *Askew,* the Eleventh Circuit granted state action to DCH, a public healthcare facility created by Alabama legislature, when it sought to expand through the acquisition of a private healthcare facility. The court found that the state's legislative authorization to hospital authorities to *"acquire,* ... enlarge, expand, alter, ... and *operate* health care facilities" and *"create, establish, acquire, operate* or support subsidiaries and affiliates, ... for profit or non-profit" made the displacement of competition foreseeable at the time the legislature gave DCH the power to acquire other hospitals. *Askew,* 995 F.2d at 1035 n. 2 (quoting Ala.Code § 22–21–318; § 22–21–358). According to *Lee County* and *Askew,* therefore, anticompetitive conduct need only be *reasonably anticipated* rather than inevitable, ordinary, or routine. *See Lee County,* 38 F.3d at 1191.

■ Anticompetitive conduct by a political subdivision under Eleventh Circuit law is even reasonably foreseeable when it is heavily influenced by the interests of, or involves, a private party. In *City of Columbia,* for example, the Court found that because the South Carolina statutes under which the city acted authorized municipalities to regulate the use of land and the construction of buildings and other structures within their boundaries, the suppression of billboard advertising competition from newcomers and the protection of existing billboards, including those owned by the company which had enjoyed a majority of the market share, were reasonably anticipated to result from the city ordinances at issue that regulated the size, location, and spacing of billboards. 499 U.S. at 373, 111 S.Ct. 1344. The Court reached this finding notwithstanding the city's and private billboard company's alleged involvement in a secret anticompetitive agreement to protect the company's monopoly position in billboard advertising, the close relationship between city officials and the company, and the alleged efforts of the company to lobby the city to enact the challenged ordinances. *Id.; cf. Cine 42nd Street,* 790 F.2d at 1046–48 (permitting private parties, as well as urban development corporation (UDC), to enjoy state's immunity from antitrust liability for anticompetitive consequences resulting from acquisition and lease of five movie houses to private party theatre operators, to which UDC had designated operational powers).

The absence of public health, safety, morals, or the general welfare of the community from the city ordinances, as well as the company's alleged motivation of the enactment of the ordinances, was immaterial, for public officials, the Court reasoned, often agree to do what groups of private citizens urge upon them. *City of Columbia,* 499 U.S. at 374, 368, 375, 378, 111 S.Ct. 1344; *cf. Cine 42nd Street,* 790 F.2d at 1035 (acknowledging necessity of government involvement in effectuating policies and goals to cure ailing economy and reverse urban blight when private parties in the free market enterprise cannot alone do so). It was enough that the suppression of competition was, at the very least, a foreseeable result of the state's enabling legislation. *City of Columbia,* 499 U.S. at 368, 111 S.Ct. 1344; *see also Town of Hallie,* 471 U.S. at 39, 105 S.Ct. 1713 (explaining that although compulsion is often best evidence of state policy, "clear articulation" requirement of state action test does not require that defendant show state "compelled" it to act, but at minimum, to only show reasonable anticipa-

tion). So long as this requirement is met, "the [state] action is exempt from private antitrust liability regardless of the State's motives in taking the action," *City of Columbia*, 499 U.S. at 377–78, 111 S.Ct. 1344 (citation omitted), and even where an authority conspires to bring about anticompetitive conduct based on a pretext for the public good, *Bolt*, 980 F.2d at 1387.

For this reason, the Supreme Court and Eleventh Circuit have rejected inquiries into the motives and reasons for a government's anticompetitive actions. Not only are "very few government actions ... immune from charges that they are not in the public interest," but "judicial [probing] and assessment of the public interest after the fact ... compromise[s] the ability of the states to regulate their own commerce," thereby rendering state action immunity meaningless. *Id.* at 1388–89 (quoting *City of Columbia*, 499 U.S. at 377, 111 S.Ct. 1344) (prohibiting inquiry into whether authority's allegedly anticompetitive denial of staff privileges to plaintiff were pretextual or furthered public good).

### 2. Immunity of State Actors' Agents and of Private Parties

■ Because of this prohibition into possible private motives of state anticompetitive action, federal antitrust laws cannot regulate the conduct of private individuals in seeking anticompetitive action or in influencing government officials to engage in conduct of such behavior. *See City of Columbia*, 499 U.S. at 378–80, 111 S.Ct. 1344. This action is protected by the *Noerr–Pennington* doctrine, a corollary to

the state action doctrine, which shields from antitrust review concerted efforts to influence public officials regardless of intent or purpose, and even where anticompetitive results are brought about by deception or bribery.[17] *Id.*

Furthermore, actions of a private party also can be considered actions taken by the same as an agent of a political subdivision, such that it should share the political subdivision's immunity. *See Crosby*, 93 F.3d at 1529. The appropriate inquiry for this rule focuses on whether "there is *little or no danger that the actor is involved in ... private*" conduct "as opposed to state action vindicating a truly governmental interest." *Id.* at 1530 (emphases added) (quoting *Town of Hallie*, 471 U.S. at 47, 105 S.Ct. 1713). If the action is truly that of the state and not of an individual or private actor, then the private parties will receive the state action immunity of the political subdivision, and the need for evaluation of the *Midcal* "active state supervision" element for private parties is eliminated. *Id.* at 1530–31; *see, e.g., Cine 42nd Street*, 790 F.2d at 1047–48 (declining to apply active supervision requirement because private party theatre operators operating in concert with urban development corporation enjoyed state's antitrust immunity, given clearly articulated state policy that private parties and government necessarily work together to effectuate city's mission to cure urban blight).

To illustrate, in *Crosby*, a suit challenging an allegedly anticompetitive peer re-

---

17. *Noerr–Pennington* has recognized a "sham" exception to this rule: where a private party's petitioning of a governmental entity is not a genuine attempt to procure favorable government action but is instead an attempt to directly interfere with the business relationships of a competitor through improper means, for example, of delay and expense, federal antitrust laws apply. *See City of Columbia*, 499 U.S. at 380, 381, 111 S.Ct. 1344 (explaining as example where delay is sought to be achieved by lobbying process itself and not by governmental action that lobbying seeks). Here, however, Plaintiffs have not alleged that this exception applies, and for reasons explained in Part I.c.ii, *see* supra pp. 1376–81, the Court does not find that the facts warrant the application of this exception.

view decision to deny a doctor staff privileges at a hospital, the Eleventh Circuit considered the actions of individual doctors on peer review committees as the actions of a hospital authority, without an assessment of the "active supervision" element. 93 F.3d at 1530–31; *cf. Univ. Health, Inc.*, 938 F.2d at 1213 (explaining that where state's policy is exercised by hospital authority—even where it has delegated its statutory powers to university hospital—active supervision is not required).

The court's ruling was based on the fact that the (1) the control exercised by the hospital authority over the peer review decisions, specifically its retention of power over decisions to grant or deny hospital privileges, and (2) the overall statutory context of peer review in Georgia, that is, the statutory requirement that hospitals provide for the review of professional practices in a hospital. *Id.* at 1530–31. Had the court held otherwise—that is, had the authority but not the private defendants been deemed immune for an action performed with or on behalf of the authority—it would have defeated the purpose of antitrust immunity by permitting the plaintiff to sue the private defendants for the conduct of the authority that had already been declared immune. *See id.; see also Cine 42nd Street*, 790 F.2d at 1048.

In sum, therefore, a greater level of state involvement in anticompetitive conduct must be demonstrated if the defendant is a private party rather than a political subdivision. If not a state actor or a private party, a defendant travels under the three-part test from *Bolt* and *Town of Hallie* to show "clear articulation"; if, however, the defendant is a private party, it travels under the two-prong *Midcal* test—i.e., defendant must show clear articulation and active supervision, unless it can establish that it acted pursuant to *Noerr–Pennington* or as an agent of the political subdivision which has received antitrust immunity. Thus, the Court now turns to its analysis of whether the Authority, Phoebe Putney, and HCA/Palmyra should be evaluated as private actors, political subdivisions, or agents thereof.[18]

### ii. *Analysis*

#### 1. Immunity of the Authority of Albany–Dougherty County, Georgia

The Court first analyzes the Authority's entitlement to state action immunity. As previously established, the enabling legislation need not explicitly authorize the exact actions undertaken to establish foreseeability. Rather, "it is only necessary

---

**18.** What raises the close but difficult question for the Court to decide in this case is the identification of the exact Defendants that Plaintiffs can actually enjoin under the Clayton Act and the FTCA. The difficulty arises based on the factual distinctions between the structure of the alleged transaction in this case and the acquisitions at issue in Supreme Court and Eleventh Circuit state action immunity precedent. *Lee County* and *Askew*, for example, primarily concern a party's challenge to a political subdivision's (or state actor's) "acquisition" of the competitor of the entity already owned and operated by the political subdivision. Plaintiffs, however, do not solely challenge the Authority's acquisition of the competitor (Palmyra) of the hospital which it already owns (PPMH). Rather,

the crux of the challenged action is the Authority's intended assignment of its control and operation of the acquired hospital, Palmyra, to the parent company of the acquired hospital's only current competitor, PPHS, so as to circumvent the antitrust laws. In light of this distinction, the Parties rightfully dispute whether the challenged acquisition is being directed by the Authority or the private Phoebe Putney and HCA/Palmyra Defendants or both. Accordingly, the Court assesses both the challenged conduct of the Authority as a political subdivision *as well as* the conduct of Phoebe Putney and HCA/Palmyra as private entities under the appropriate state action immunity tests, which vary based on the nature of the party which seeks its protection.

that the permitted actions produce anti-competitive consequences that foreseeably flow from the grant of state authority; that is, "the enabling statute must ... create grounds for a *reasoned belief* that *some anticompetitive activity could be envisioned.*" " *Cine 42nd Street,* 790 F.2d at 1043–44 (emphases added). To grant state action immunity to the Authority in this case, the Court, therefore, must find it reasonably foreseeable that when the legislature equipped a hospital authority with the power to lease a hospital to another (the lessee) and grant the lessee the right to operate said hospital, it contemplated that the lessee could have once been a competitor of the Authority's newly acquired and leased hospital. To reach such a finding, a review of Georgia Hospital Authorities Law is required.

### a. Formation, Purpose, and Powers of the Albany–Dougherty County Hospital Authority

Pursuant to the Hospital Authorities Law, O.C.G.A. § 31–7–70 *et seq.,* the Georgia legislature "created *in and for each county and municipal corporation* of the state a public body corporate and politic to be known as the 'Hospital Authority' of such county or city...." O.C.G.A. § 31–7–72(a) (emphasis added). A hospital authority is "deemed to exercise public and essential governmental functions and [has] all the powers necessary and convenient to carry out and effectuate the purposes and provisions of [the Hospital Authorities Law]." O.C.G.A. § 31–7–75. An authority may not operate for profit, however, and must set its rates and charges only in amounts sufficient to operate, service debt and bond obligations, and maintain "reserves for improvement, replacement, or expansion of its facilities or services." O.C.G.A. § 31–7–77. In 1941, the Hospital Authority of Albany–Dougherty County, Georgia, was jointly activated pursuant to a resolution by the City of Albany and Dougherty County, Georgia, to execute the goals represented by the Georgia Hospital Authorities Law. *See* Ex. PX008.

As noted above, *see supra* note 16, a hospital authority's powers include, in addition to those necessary to operate a hospital, "[t]o acquire by purchase, lease, or otherwise and to operate projects," O.C.G.A. § 31–7–75(4), which are defined as "the acquisition ... and equipping of hospitals ... to promote the public health needs of the community," O.C.G.A. § 31–7–71(5). Section 31–7–75(7) also authorizes a hospital authority to lease for any number of years not to exceed forty for the operation of any project by another, provided that authority determines that lease will promote public health needs of community by making additional facilities available or reducing healthcare costs, and that authority retain sufficient control over any project so leased so as to ensure that lessee will not in any way receive more than reasonable rate of return on its investment in the project. *Id.* § 31–7–75(7). Hospital authorities may also execute their acquisition and leasing powers by partnering directly or indirectly with other hospitals, facilities, and health care providers to arrange for the provision of health care services. § 31–7–75(27). Thus, an authority's powers, including those of the Authority in this case, appear to be as broad and diverse as the problems they are designed to address.

### b. The 1990 Lease of PPMH by the Authority

Pursuant to the Hospital Authorities Law, in December 1990, the Authority entered into a Lease and Transfer Agreement, with respect to the assets and operation of PPMH. Under the Lease, which has been extended on several occasions to a 2042 expiration date (Doc. 2 ¶ 27), the Authority operates PPMH as a lessee for purposes of carrying out the mission of the Authority. Ex. PX002; *see also* Ex.

PX008 (resolutions explaining acknowledgments of Authority). Although the Authority leases PPMH assets to PPMH, Inc. for $1.00 annum under the Lease, the Authority holds title to and is therefore the legal owner of PPMH's assets (Doc. 2 ¶ 27). In fact, because PPMH and PPHS are dissolved "upon the expiration or earlier termination of" the Lease, Ex. PX002–007, all leased assets, along with PPMH's and PPHS's assets, revert to the full control of the Authority upon such expiration, Ex. PX002 § 3.02.

Pursuant to the Lease terms, the Authority has delegated to PPMH, Inc., among other responsibilities, its powers to provide indigent care in fulfillment of the Authority's agreement with Dougherty County, Ex. PX002 §§ 4.02, 4.18, and to set rates and charges for PPMH, Ex. PX002 § 4.03(b). Moreover, Phoebe Putney, which owns PPMH, Inc., pays all expenses of the Authority, which has no budget, no staff and no employees, and the Authority is composed of appointed, unpaid members. (Doc. 2 ¶ 27). Despite the delegation of rights to Phoebe Putney with respect to PPMH, the Authority may terminate the Lease if PPMH, Inc. materially fails to operate PPMH in compliance with the Lease terms and delegated responsibilities. Ex. PX0002–46 §§ 9.01–9.03, 9.07.

Plaintiffs reason that this relationship between Phoebe Putney and the Authority under the 1990 Lease indicates that the Authority will have no authority over or interest in overseeing the administration of Palmyra once the transaction now at issue is consummated. (Doc. 61 at 26). On the totality of the foregoing allegations, along with those provided in the Procedural and Relevant Factual Background Section, see supra, Plaintiffs claim that the Authority "rubberstamped the transaction" and used the Authority as a "strawman," thereby disqualifying Defendants for antitrust immunity (See id. at 17, 23; see also Doc. 2 ¶ 85).

Defendants, however, submit that this relationship represented by the 1990 Lease evidences that PPMH, Inc. exists to operate and support PPMH and does so only for so long as it complies with the 1990 Lease. To Defendants, therefore, a similar relationship will exist between Phoebe Putney, specifically PNI, and the Authority for the former's operation of Palmyra pursuant to the terms of the subject transaction and in a manner immune from antitrust scrutiny. (Doc. 45–1 at 9–10). The Court agrees for reasons discussed below.

■ While the Court must accept Plaintiffs' well-pleaded version of the facts as true and view them in a light most favorable to Plaintiffs, it is not required to accept Plaintiffs' legal conclusions as to the unavailability of state action immunity to Defendants. Pursuant to its own review of the Supreme Court and circuit precedent and relevant Georgia statutes, the Court concludes that the provisions of Georgia Hospital Authorities Law, O.C.G.A. § 31–7–70 et seq., that concern the powers of hospital authorities in the State of Georgia have created a scheme for establishing and enforcing anticompetitive conduct, particularly through leasing authority-owned hospital facilities or property to another hospital or its affiliated entity as manager and lessee.

As previously established, see supra pp. 1375–76, Georgia has broadly authorized the Authority to "acquire by purchase" hospital projects and to lease these hospitals to others for a period of up to forty years, O.C.G.A. § 31–7–75(4), (6), limited the Authority's execution of such powers to the city or county that activated the Authority, i.e., its "area of operation," id. § 31–7–71(1), and required that the Authority operate on a non-profit basis, id.

§ 31–7–77. Moreover, § 31–7–75(27) authorizes a hospital authority "[t]o form and operate, either *directly or indirectly,* one or more networks of hospitals, physicians, and other health care providers and to arrange for the provision of health care services through such networks." *Id.* § 31–7–75(27) (emphases added).

The totality of these grants of authority, the geographic limitation, and the non-profit requirement demonstrates that the Georgia legislature intended to guarantee that hospital authorities could accomplish their mission of promoting public health notwithstanding the anticompetitive results.[19] Much like the language of the hospital authorities law at issue in *Lee County,* the Hospital Authorities Law's restriction of a hospital authority's power to acquire and lease in the city or county in which it was created, so as to carry out its statutorily designated duties and powers, is bound to result in an authority's—here, the Authority of Albany–Dougherty, County's—acquisition of multiple hospitals that possibly were once competitors of each other, and its lease of those hospitals—Palmyra and PPMH—to other hospital entities or networks—here, PPHS—that may own, operate, or manage existing hospitals that once competed with those authority-owned and -acquired hospitals. Specifically, because the authority's exercise of the abovementioned powers, which was restricted to Lee County in *Lee County* was likely to result in an authority's monopolistic control of hospitals in. Lee County, the Authority's exercise of the same powers here, which are restricted to the "area of operation" of Albany, Dougherty, County, Georgia, makes the Authority's ownership and lease of PPMH and Palmyra, the two major hospital competitors in Albany, Dougherty County, Georgia, reasonably foreseeable. The same reasoning flows from *Askew.*[20]

Only one hospital, PPMH, existed in Albany, Dougherty County, when the Authority was created. Thus, once authorized to acquire additional hospitals and in view of the reality of its lack of funds and resources, the Authority was foreseeably likely to acquire and lease hospitals in the manner proposed in this case. And the fact that the Authority, with no staff or budget of its own, is statutorily empowered to add new facilities and to lease facilities to other hospitals—which, once again, must be within its area of operation—increases the likelihood that it may enter into a lease for the operation of one of its acquired hospitals by another hospital or hospital network with which the acquired hospital once competed. Such a finding is underscored by the fact that significant barriers to entry into the healthcare market already exist, for example, under Georgia Certificate of Need (CON) laws, which require the issuance of a CON prior to a hospital's provision of specific types of healthcare services at newly built facilities. *See* O.C.G.A. §§ 31–6–41, 31–6–42.

The Court reaches this finding notwithstanding the accomplishment of a hospital authority's acquisition and lease of a hospital with the assistance of private parties.

---

19. By inference, therefore, the public may benefit from anticompetitive acquisitions authorized under Georgia Hospital Authorities Law. In this light, state action that results in public good and state action that results in anticompetitive effects are not absolutely mutually exclusive if such actions are taken pursuant to the aforementioned hospital authorities powers.

20. Although the Georgia legislation does not explicitly authorize the anticompetitive acquisition and operation of multiple hospitals in a single county, as did the Alabama legislation in *Askew,* controlling precedent has confirmed that the enabling legislation need not be explicit. *See supra* pp. 1370–71.

In fact, the Court finds that the statutory language concerning hospital authorities' powers encourages and may reasonably require hospital authorities to work with private parties so as to realize hospital authorities' statutorily imposed duties and powers. Sections 31–7–75(4), (6), (7), and (27), see supra, indicate that the governmental obligation of a hospital authority to provide for the health of the people can be discharged by its acquisition of existing hospital facilities (as well as by the construction of new hospitals) and by the sale or lease of the hospital to others, including private corporations which operate the hospitals to promote the health functions of government. Bradfield v. Hosp. Auth. of Muscogee County, 226 Ga. 575, 176 S.E.2d 92, 99 (1970). Provided the lease is consistent with the authority's obligation to provide for the health of the people, an authority may even delegate its duties of operation to a private non-profit corporation. § 31–7–75(7), (27); see, e.g., Richmond County Hosp. Auth. v. Richmond County, 255 Ga. 183, 336 S.E.2d 562, 564 (1985) (holding that Hospital Authorities Law authorizes corporate restructuring of hospital authority through lease and transfer of hospital assets to a new 501(c)(3), nonprofit corporation and establishment of parent holding company structure).

Furthermore, the absence of the Authority's own budget, as well as the statutory prohibition on authorities' operation for profit, makes it reasonably foreseeable that hospital authorities would work with private hospitals or hospital networks to operate hospitals. Without the assistance of third parties for funding, resources, and personnel, hospital authorities likely find it difficult to operate and discharge their mission for the provision of healthcare services. The Court finds that this represents a reality that the legislature reasonably foresaw, similar to the court's acknowledgment in Cine 42nd of the reasonable foreseeability of the necessary collaboration between private entities and the local government to revitalize blighted urban areas in New York City.

Therefore, so long as the Authority determines that the proposed transaction will continually fulfill the Authority's mission to promote public health needs of the community and allow it to retain public control of Palmyra as is contemplated by the Hospital Authorities Law—which it has done here, see Ex. PX008—the Authority may collaborate with private parties such as Phoebe Putney to execute the proposed transaction, without being subject to antitrust liability. In this light, the subject transaction, including the lease stage, merely represents the application of approved principles of the Hospital Authorities Law to new conditions. See Richmond County, 336 S.E.2d at 564.

The Court reaches the above findings, even accepting Plaintiffs' allegations that the subject transaction was effectively motivated and controlled by PPHS through its own independent private and pecuniary interests and that the transaction was structured to circumvent antitrust law. Not only does City of Columbia expressly forbid the Court's inquiry into such reasons for and motivations behind acquisitions and their structure, but it, along with Cine 42nd Street, also illustrates that the private Defendants, specifically Phoebe Putney, can motivate, influence, and work on behalf of and with a political subdivision to knowingly bring about anticompetitive results, free of the risk of antitrust enforcement.

Contrary to Plaintiffs' claims, therefore, whether the Authority authorized the purchase of Palmyra without considering, among other factors, the anticompetitive adverse effect of the acquisition on healthcare in the community and alternatives to leasing Palmyra to Phoebe Putney becomes irrelevant. Like the Court's treatment of the producers' required ref-

erendum and approval of the marketing program in *Parker*, the Court here finds that "[the Authority] ... has created the machinery for" structuring and executing the transaction, although Phoebe Putney negotiated, promoted, and lobbied for the transaction. *Parker*, 317 U.S. at 346–47, 352, 63 S.Ct. 307. The power to produce anticompetitive effects rests with hospital authorities like the Hospital Authority of Albany–Dougherty County, which has the authority to structure hospital management and operation in a number of ways. Simply put, the state therefore has put the ultimate say-so for the provision and management of healthcare in the hands of the healthcare authorities, even if private actors whose conduct brings about anticompetitive conduct have some role in that decisionmaking process. For this reason, as well as those previously discussed, the Court holds that the Authority is immune from antitrust scrutiny in the current case. The Hospital Authority of Albany–Dougherty County's Motion to Dismiss (Doc. 45) is therefore **GRANTED.**

### 2. The Immunity of Phoebe Putney and HCA/Palmyra

■ The Court also holds that state action immunity applies to the private Defendants as well, as the challenged action at issue here is really directed by the Authority and not Phoebe Putney.[21] While PPHS allegedly served as the negotiator, guarantor, and funder of the transaction, the Court holds that such conduct constitutes private encouragement of, private involvement in, or agency action on behalf of a local government that is permitted under *Noerr–Pennington* or the

principles established in *Cine 42nd Street* and *Crosby* that establish a private actor's enjoyment of the state's antitrust immunity under *Parker*. Accordingly, as Defendants note, Plaintiffs are incorrect in their implied position that even if the Authority is entitled to immunity, Phoebe Putney is not. Once the Authority is deemed immune for its anticompetitive conduct, any actions taken by the private actors to prompt or engender that conduct must also be immune.

*Noerr–Pennington*, along with the state action doctrine, therefore forbids Plaintiffs' attempt to hold Phoebe Putney, a private party, liable for a hospital acquisition by the Authority, a local government actor that has received antitrust immunity. The fact that Phoebe Putney may have an interest in controlling Palmyra and that it has acted on this interest in petitioning the Authority and negotiating and structuring the transaction means nothing; what governs is the enabling legislation, as assessed above and whether it expresses a policy that makes the anticompetitive conduct now at issue reasonably foreseeable. *See supra* Part I.c. Because the Court has found that it does, Phoebe Putney's interest in controlling Palmyra and its associated actions to actualize their interests are protected and thereby have no relevance to this Court's analysis of Phoebe Putney's entitlement to state action immunity as a private party.

Moreover, even if Phoebe Putney is not considered a private party whose actions are protected under *Noerr–Pennington*, it may be considered an effective agent of the Authority based on its negotiation of, planning for, and funding and facilitation

---

**21.** The Court's analysis solely centers on the immunity of Phoebe Putney, as Plaintiffs claim that Phoebe Putney, not HCA/Palmyra, directed, engaged in, and brought about the anticompetitive conduct. Phoebe Putney, along with the Authority, is therefore the primary alleged violator of the FTCA and Clay-

ton Act. (*See generally* Doc. 2). Moreover, any finding as to the application of immunity to Phoebe Putney would necessarily extend to HCA/Palmyra, as the transaction cannot proceed without HCA/Palmyra's sale of Palmyra to the Authority.

of the subject transaction. The Phoebe Putney's actions which are challenged in this case can thereby be considered actions taken in performance of its official duties as an agent of the Authority, such that Phoebe Putney should share the Authority's state action immunity. Several of the documents associated with the execution of the transaction confirm this agency role assumed by Phoebe Putney and that the Authority, not Phoebe Putney, is responsible for actions relevant to the Court's review and will retain legal and economic control over Palmyra.

To illustrate, the Asset Purchase Agreement between PPHS and Palmyra states that it is being entered into by "the Authority, *as buyer*, Palmyra, *as seller*, [Phoebe Putney], as *guarantor* of the obligations of the Authority and PNI." Ex. PX226–01 (emphases added); *see also* Ex. PX009 § 2.02 (explaining that Authority remains owner of Palmyra's sold assets and therefore, "shall at all times have during the Operating Period have ultimate control over the assets and operations of [Palmyra]"). As such, pursuant to the terms of the Management Agreement, PNI was created by PPHS to serve, under PPHS's control, as the day-to-day Manager of assets used exclusively in the operation of Palmyra. Yet Phoebe Putney is still required to operate Palmyra, through PNI, according to the Authority's instructions and not its own desires: it "shall be responsible for the performance of all acts reasonably necessary or required in connection with the operation of [Palmyra] in *accordance with the Authority's directions*" and "in managing [Palmyra] shall *follow the charity and indigent care policies of Authority* and *shall assist Authority in meeting all of Authority's required obligations* under Hospital Authori-

ties Law. *See, e.g.,* Ex. PX009 § 3.03(c), (e) (Management Agreement) (emphases added).

Much like the private party theatre operators in *Cine 42nd Street* who operated in concert with the urban development corporation and to whom the urban development corporation had delegated its rights for the operation of the theatres, any actions of Phoebe Putney in its operation of Palmyra are therefore intended to effectuate the Authority's purpose. Although the Authority has "delegated control and authority for overseeing Medical Staff affairs, treatment and related functions [at Palmyra] to [Phoebe Putney]," Phoebe Putney is merely an "agent" of the Authority in operating Palmyra, *see, e.g.,* Ex. PX009 § 3.03(b) (stating that Phoebe Putney "acts in Authority's name and as agent for" Authority in making deposits and disbursements), and as stated in the Management Agreement, owes the Authority a fiduciary duty with regard to the performance of its responsibilities on the Authority's behalf, Ex. PX009 § 2.01; *see also* Ex. PX009 §§ 3.09, 3.10 (explaining Phoebe Putney's obligation to ensure Authority's continuous compliance with applicable laws required for ongoing operation of Palmyra and protection of confidentiality of records of Authority).

Thus, while Phoebe Putney or a PPHS entity such as PNI will operate Palmyra as lessee once it is acquired and leased by the Authority to Phoebe Putney, the Management Agreement and to a degree, the Asset Purchase Agreement thereby ensure that Phoebe Putney understands that it does not operate Palmyra independent of the Authority and that the Authority is the ultimate decisionmaker of all project decisions.[22] For example, Phoebe Putney must obtain prior Authority approval for

---

22. As a corollary to this power of the Authority, the Authority also bears the ultimate risk of loss with respect to Palmyra's operations as well as the ultimate liability incurred by the Authority as a result of Phoebe Putney's per-

its retention of consultants, accountants, or other professional personnel or for its entry into contracts on behalf of the Authority whose costs exceed $10,000, Ex. PX009 § 3.02, § 3.05; its Chief Compliance Officer must report directly to the Authority, Ex. PX009 § 3.13(g); Phoebe Putney must prepare and present to the Authority for its review annual budgets for Palmyra, Ex. PX009 § 3.04(g); and Phoebe Putney shall not make "any change in the licensure, payment model, classification or operations of [Palmyra, without the Authority's] ... prior written approval," Ex. PX009 § 3.14.

Because Phoebe Putney will not be able to exercise control over Palmyra's operations independent of the Authority, the Court therefore holds that Phoebe Putney's actions in the transaction are considered those of the Authority, which the Court has already ruled is entitled to immunity. Were the Court to hold otherwise, the state action immunity afforded to the Authority would be meaningless. *See Crosby,* 93 F.3d at 1532. Phoebe Putney's and HCA/Palmyra's Motions to Dismiss (Docs. 46, 53) are thereby **GRANTED.**

**II. *Plaintiffs' PI Motion***

In view of the Court's grant of Defendants' Motions to Dismiss, the Court need not further address Plaintiffs' PI Motion. *See Lee County,* 38 F.3d at 1192 ("[If] the allegedly anticompetitive results were foreseeable under the state action doctrine, it

formance of its duties under the Management Agreement. Ex. PX009 §§ 4.01, 4.02.

**23.** For this reason, and for reasons stated in note 8, *see supra,* the Authority's and HCA's

is unnecessary to determine whether the acquisition [potentially] violates the Clayton Act [for purposes of granting preliminary injunctive relief."). Plaintiffs PI Motion (Doc. 5) is thus **DENIED.**

### *CONCLUSION*

For all of the foregoing reasons, the Court rules that Defendants are immune from antitrust liability under the Clayton Act and the Federal Trade Commission Act. Thus, the Hospital Authority of Albany–Dougherty County's Motion to Dismiss or Alternatively, for Summary Judgment and to Vacate the Temporary Restraining Order (Doc. 45); HCA, Inc.'s and Palmyra Park Hospital, Inc.'s Cross–Motion to Dismiss or Alternatively, for Summary Judgment and to Dissolve the TRO (Doc. 46); and Defendants Phoebe Putney Health System Inc.'s, Phoebe Putney Memorial Hospital, Inc.'s, and Phoebe North, Inc.'s Motion to Dismiss and Vacate the TRO (Doc. 53) are **GRANTED.**[23] Plaintiffs' Complaint (Doc. 2) is also **DISMISSED WITH PREJUDICE.** Plaintiffs' Motion for Preliminary Injunction (Doc. 5) is therefore **DENIED,** and the Court's April 22, 2011 Order (Doc. 9) granting Plaintiffs' Motion for Temporary Restraining Order (Doc. 4) is **DISSOLVED.**

and Palmyra's Alternative Motions for Summary Judgment (Docs. 45, 46) are **DENIED.**